Raffaele DONNARUMMA, Antonino Sirei, Giuseppe Costa, Stanislao Magliulo, Francesco Bivona, Leonardo Altomare, Giuseppe Roccasalvo, Darcisco Assereto, Salvatore Monte, Francesco Somma, Giannino Perazzo, Angelo Scognetti, Alfio Grazioli, Antonio Canepa, Elvira Cacace Donnarumma, Individually, and on behalf of the Estate of Antonio Donnarumma, Deceased, Franca D'Asaro, Individually, and on behalf of the Estate of Calogero D'Asaro, Deceased, Giuesseppe Orgioli, Individually, and on behalf of the Estate of Emanule Orgioli, Deceased, Santo Zammataro, Individually, and on behalf of the Estate of Alfio Zammataro, Deceased, and Lisa Scarogni, Individually, and on behalf of the Estate of Umberto Scarogni, Deceased, Plaintiffs,

v.

BARRACUDA TANKER CORP., Hendy International Co., and Union Oil Co. of California, Defendants.

No. CV 77–1026–RJK.

United States District Court, C. D. California.

Feb. 28, 1978.

Thomas Paine Dunlap, Beverly Hills, Cal., for plaintiffs; Semel, Patrusky & Buchsbaum, New York City, of counsel.

Lillick McHose & Charles, Francis J. MacLaughlin, Los Angeles, Cal., for defendants.

## MEMORANDUM OF DECISION AND ORDER

KELLEHER, District Judge.

Three proposed compromise settlements are before the Court for approval regarding wrongful death claims brought by plaintiffs under the Jones Act, 46 U.S.C. § 688.[1] Two of the settlements (Franca D'Asaro and Elvira Cacace Donnarumma) include claims by minor children; the third (Lisa Scarogni) includes releases made by children who have reached the age of majority;[2] and each of the proposed settlements provides. for the payment of attorney's fees to plaintiff's attorneys in the amount of one third of the settlement amount, pursuant to a contingent fee agreement between plaintiff and her attorney. The Court's approval of the proposed compromise orders is sought pursuant to the rules of this Court to oversee the settlement of all claims brought on behalf of minors and incompetents, and to supervise the disbursement of funds deposited in trust accounts pursuant thereto. Rule 22, Local Rules of the United States District Court for the Central District of California.[3]

1. Widows of deceased seamen are named plaintiffs, suing individually and on behalf of the estates of the deceased.

2. In the three compromise orders before the Court, the first (D'Asaro) involves three minors and the second (Donnarumma) involves two minors. The third (Scarogni) involves two children, ages 21 and 26, who have released defendants for any claims they might have in favor of the settlement achieved on behalf of their mother.

3. Local Rule 22 provides:
 (a) *Application for Settlement of Claim of Minor or Incompetent Person*:
 No claim of a minor, or incompetent person shall be settled, or compromised without leave of court embodied in an order, judgment, or decree. In so far as practicable, the proceedings and hearing upon an application to settle, or compromise any such claim shall conform to Section 372 of the California Civil Code of Procedure and Rule 529(a), (b), and (c) of the California Rules of Court.
 (b) *Attorney's Fees*:
 In all cases involving the claim of a minor or incompetent person, the court shall fix the amount of attorney's fees.
 (c) *Payment and Disbursement of Funds*:
 All monies or property recovered by a minor or incompetent person, either by way of settlement or judgment, shall be paid into the registry of the court and shall be disbursed by the clerk upon order of the court in accordance with the provisions of Section 1510 of the California Probate Code, provided that if the minor or incompetent person, guardian, or parent is a resident of a state other than California, the funds or property shall be disbursed pursuant to restrictions similar to those imposed by said California Probate Code, Section 1510.

Before any funds or property are ordered distributed to any guardian, there shall be filed in this court a certified copy of letters of guardianship and a certificate issued by a state court certifying that a surety bond has been filed by the guardian in a sum equal at least to the amount of money or the value of the property to be received by the ward, or a certified copy of an order made in accordance with the provisions of California Probate Code, Section 1480.5, certifying that the security is at least equal to the money or value of the property to be received, provided, however, if letters of guardianship have been issued to a corporate guardian authorized by state law to act as guardian, no certificate of the filing of a bond shall be necessary. California Code of Civil Procedure § 372 provides, in pertinent part:
When a minor, or an insane or incompetent person is a party, he must appear either by guardian of the estate or by a guardian ad litem appointed by the court in which the action is pending, or by a judge thereof, in each case. A guardian ad litem may be appointed in any case, when it is deemed by the court in which the action or proceeding is prosecuted, or by a judge thereof, expedient to represent the minor, or insane, or incompetent person in the action or proceeding,

The terms and provisions of each of the proposed settlements in all other respects as regards the interests of the minors appearing fair and reasonable, the sole issue before the Court concerns approval of the aforementioned provision for attorney's fees to be paid out of the minors' share of the settlement funds. The Court, subject to the modification with respect to the award of attorney's fees, hereby approves such portions of the D'Asaro and Donnarumma proposed compromise orders relating to the settlement and release of claims brought on behalf of the minors, as are embodied in the Order set forth below. As to those portions of the D'Asaro and Donnarumma proposed compromise orders which relate to the settlement and release of the claims of each plaintiff widow brought in her individual capacity, and as to the Scarogni proposed compromise order, the Court, finding that such portions of and such proposed orders are not properly before the Court in that formal approval is not required, declines to enter any order approving the settlement of such claims or the disbursement of funds pursuant thereto.

## BACKGROUND

This action arises out of an explosion which occurred aboard the defendants' vessel on or about December 17, 1976, while it was in the harbor at San Pedro, California. The complaint, filed March 18, 1977, names nineteen plaintiffs, eighteen of whom are or have been represented since the inception of this action by the law firm of Semel, Patrusky & Buchsbaum. All plaintiffs are non-English speaking Italian nationals. As to fourteen of the named plaintiffs (hereinafter "injury plaintiffs"), all of whom were seamen working aboard defendants' vessel at the time of the explosion, the complaint sets forth causes of action for personal injury; as to the remaining five named plaintiffs (hereinafter "estate plaintiffs"), four of whom are widows representing themselves and the estates of their deceased spouses (all of whom were killed in the explosion), the complaint sets forth claims for wrongful death.[4]

Following the filing of the answer on May 3, 1977, no documents (e. g., interrogatories, requests for admissions, notices of deposition, requests for documents, or motions) were filed with the Court by either party until the proposed compromise orders were lodged on November 2 and 3, 1977. Nothing further having been filed thereafter, the Court ordered a status conference on

---

notwithstanding he may have a guardian of the estate and may have appeared by him. The guardian of the estate or guardian ad litem so appearing for any minor, or insane or incompetent person in any action or proceeding shall have power, *with the approval of the court* in which such action or proceeding is pending, to compromise the same, to agree to the order or judgment to be entered therein for or against his ward, and to satisfy any judgment or order in favor of said ward or release or discharge any claim of said ward pursuant to such compromise. Any money or other property to be paid or delivered for the benefit of a minor or insane or incompetent person pursuant to said order or judgment shall be paid and delivered in the manner and upon the terms and conditions specified in Section 1510 of the Probate Code.

. . . . .

[Emphasis supplied.]
California Probate Code § 1510 provides, in pertinent part:

. . . *If* the judgment is for the recovery of money in excess of two thousand dollars or other property exceeding two thousand dollars in value, and *there is no general guardian of the minor, the court* in which said judgment is entered *must require a general guardian to be appointed and must direct that the money or other property be paid or delivered to such guardian or in lieu thereof it must require that any moneys so paid be deposited in a bank or trust company subject to withdrawal only upon the order of the court* or, as to any property to be received by the minor shall prescribe such conditions as the court may deem proper.
[Emphasis supplied.]
The plaintiff widows Franca D'Asaro and Elvira Cacace Donnarumma are general guardians of the minors.

4. The fifth estate plaintiff named in the complaint (Orgioli) is not represented by the Patrusky firm, but instead by other attorneys who filed a separate action on March 15, 1977 arising out of the December 17, 1976 explosion. (CV 77–0963–RJK) That action, in which defendants have admitted liability, is pending before this Court solely with respect to the issue of damages.

January 9, 1978, in order to ascertain more facts than revealed by the sparse file, as a basis for an evaluation of the provisions of the proposed settlement and particularly a determination of an appropriate award of attorney's fees. Bernard Patrusky, Esq., appeared for plaintiffs.[5] At the conclusion of that hearing, the Court, having determined that approval of the proposed orders could not be made appropriately on the basis of oral recitals of a necessarily general nature, ordered Mr. Patrusky to file with the Court whatever supplemental material he chose (including his affidavit or declaration) to apprise the Court of the services performed by his firm on behalf of the numerous plaintiffs in this case. The Court, concerned about the apparent overlap of services rendered for the common benefit of all plaintiffs, requested that Mr. Patrusky address himself, *inter alia,* to the following:

(1) total fees agreed to and/or paid by all plaintiffs;

(2) total fees agreed to and/or paid by each plaintiff (including the estate as to which the compromise order assertedly arrived at had as yet not been lodged [6]);

(3) total hours devoted to the case (including the percentage of the total deemed for the common benefit of all plaintiffs, as well as any breakdown as to individuals or groups of plaintiffs which Mr. Patrusky might provide);

(4) total expenses incurred by plaintiffs' attorneys [7]; and

(5) any other recitals, including but not limited to the kinds of factors commonly considered by a court contemplating an award of reasonable attorney's fees in *quantum meruit.*

During the January 9 hearing, Mr. Patrusky suggested that it would be difficult to comply fully with the Court's request, inasmuch as his firm did not maintain hourly records in cases such as the present, in which a contingent fee arrangement has been agreed to by the clients. His Supplemental Affidavit, filed January 12, 1978 (hereinafter "Affidavit"), reveals that: (a) the claims of all fourteen injury plaintiffs have been settled and are not at this time before the Court; (b) in each instance a contingent fee agreement provided for the payment of attorney's fees to Mr. Patrusky's firm in the amount of one third of the recovery obtained; (c) the gross settlement in the personal injury cases approximated $612,000; and (d) in respect thereof, the firm has received fees of $181,393.93.[8] Other recitals, not recounted here, will be set forth as appropriate to illuminate the discussion below.

■ In the three proposed compromise orders presently before the Court, the gross settlement totals $813,000; and the proposed orders provide for a total of $271,000 in attorney's fees.[9] The Court must determine whether to approve the proposed orders as lodged or to modify the provision for attorney's fees, in light of the fact that any fees awarded will deplete the fund to be paid into trust accounts for the benefit of minor children. The Court is mindful of its obligations to protect the interests of minors and in so doing to scrutinize the terms of any proposed settlement of their lawful claims, Rule 22, Local Rules of the United States District Court for the Central District of California. *See, e. g., Cappel v.*

---

**5.** Defendants' counsel, present at the January 9 hearing, took no position with respect to the award of attorney's fees.

**6.** Mr. Patrusky informed the Court on January 9 that a settlement had been reached with respect to the fourth and final estate plaintiff (Zammataro) represented by his firm; but inasmuch as the proposed compromise order reached in that case has not been lodged and thus is not presently before the Court, no disposition of that case is made by this decision.

**7.** Mr. Patrusky's firm has waived reimbursement of these expenses. His Supplemental Affidavit, filed January 12, 1978, states that these expenses approximate $27,000. Affidavit at 13.

**8.** Affidavit at 12–13.

**9.** *See supra* note 6.

**460**

*Adams,* 434 F.2d 1278, 1279 (5th Cir. 1970); *U. S. v. Reilly,* 385 F.2d 225, 228 (10th Cir. 1967); *Western Life Ins. Co. v. Nanney,* 290 F.Supp. 687 (E.D.Tenn.1968); *U. S. v. E. I. Du Pont de Nemours & Co.,* 13 F.R.D. 98, 104 (N.D.Ill.1952); *Carter Coal Co. v. Litz,* 54 F.Supp. 115, 134 (W.D.Va.1943), *aff'd,* 140 F.2d 934 (4th Cir. 1944). *Cf. also Armstrong v. Berk,* 96 F.Supp. 182, 189 (E.D.Pa. 1951).

*APPLICABLE LAW*

■ A. Jurisdiction to approve settlements and award attorney's fees.

(1) Minors

At the outset, the Court notes that

where an attorney recovers a fund in a suit under a contract with a client providing that he shall be compensated only out of the fund he creates, the court having jurisdiction of the subject matter of the suit has power to fix the attorney's compensation and direct its payment out of the fund.

*Garrett v. McRee,* 201 F.2d 250, 253 (10th Cir. 1953). The sum determined to be a reasonable attorney's fee is within the discretion of the trial court, *Monaghan v. Hill,* 140 F.2d 31, 34 (9th Cir. 1944); *Cappel v. Adams, supra,* 434 F.2d at 1280.

■ Because wards of the court are involved, the Court has both the power and the duty to determine attorney's fees irrespective of any fee arrangement, contingent or otherwise, entered into between plaintiffs and their attorneys.

In *Cappel,* the attorney representing a widower and three minor children appealed from a district court order reducing his fees from one third to one fifth for his services in representing the minors. The Court of Appeals for the Fifth Circuit affirmed, despite the existence of a one third contingent fee contract entered into between the attorney and the widower on behalf of himself and his children. The court, *per* Judge Wisdom, observed that

Contingent fee contracts have long been commonly accepted in the United States in civil proceedings to enforce

claims. Such arrangements have been traditionally justified on the ground that they provide many litigants with the only practical means by which they can secure legal services to enforce their claims. *See* ABA Code of Professional Responsibility EC 2–20 (Final Draft, July 1, 1969). Nevertheless, *the right to contract for a contingent fee has never been thought to be unrestrained.* Contingent fee contracts have been declared invalid when the agreement was to secure a divorce, or defend a criminal prosecution, or influence the passage of legislation. *Contingent fee contracts have been especially subject to restriction when the client is a minor, largely because of the obvious possibilities of unfair advantage. Moreover, courts have refused to enforce contingent fee arrangements when the amount of the fee seemed excessive.* See Recent Developments, 60 Colum.L.Rev. 242, 244–45 (1960).

434 F.2d at 1280 (emphasis supplied).

(2) Seamen and their widows

■ The Court concludes that the portions of the D'Asaro and Donnarumma proposed compromise orders dealing with the settlement of the claims of the widows brought in their own behalf and the entire Scarogni proposed compromise order are not properly before the Court for approval. The reference in Local Rule 22, quoted *supra* note 3, to an "incompetent person" does not embrace seamen and their families *per se.* Consequently, court approval is required neither under the rules of this district nor under the Jones Act, 46 U.S.C. § 688. The situation is thus unlike that in the Third Circuit. That circuit adopted a contingent fee guideline schedule in April of 1971, applicable to seamen's personal injury cases, which supersedes any contingent fee agreement reached between a seaman and his attorney which is less favorable to the client than the schedule adopted by the district. The fee schedule was upheld in the face of an attack by both attorney and client in *Schlesinger v. Teitelbaum,* 475 F.2d 137 (3d Cir. 1973), *cert. denied,* 414 U.S. 1111, 94 S.Ct. 840, 38 L.Ed.2d 738 (1973). In affirming the district court's action, the Third Circuit, quoting extensively from

Judge Wisdom's opinion in *Cappel, supra,* concluded that: "It is well recognized that the court has the power to set fees in cases involving persons of presumed incapacity to look after their affairs intelligently [citations omitted]." 475 F.2d at 139. In addition to quoting a local rule of the district which requires court approval of all settlements in actions to which a seamen is a party, *id.,* Judge Van Dusen went on to stress the fact that recent Supreme Court pronouncements attest to the continued validity of the traditional view admiralty courts have taken of seamen as "wards of admiralty." *Id.* at 140, citing *United States Bulk Carriers v. Arguelles,* 400 U.S. 351, 355, 91 S.Ct. 409, 27 L.Ed.2d 456 (1971) and *Isbrandtsen Co. v. Johnson,* 343 U.S. 779, 72 S.Ct. 1011, 96 L.Ed. 1294 (1952). Thus, beyond the Court's inherent power to supervise members of its bar in certain of their activities, "including the charges of contingent fees," 475 F.2d at 141, the Third Circuit found additional reasons for the district court's exercise of such power in the seaman's personal injury context. The court found it unnecessary to reach the petitioner's argument that the fee guidelines violated their contract and due process rights, holding that their reliance "simply on an allegation of the existence of a contingent fee agreement, which [the ambiguous record indicated] may have been dated after the establishment of the court's tentative guidelines," cannot nullify such guidelines. *Id.* at 142, 138 note 7.

Local Rule 22 of this Court requires court approval and setting of fees in compromise settlements of claims of a minor or "incompetent person." Unlike the district in the Third Circuit whose applicable local rule expressly deals with court approval of settlement of the claims of a "seaman," [10] Local Rule 22 of this district makes no such express reference; and this district's longstanding practice of not requiring court approval of settlements of seamen's claims

indicates that, without more, seamen, regardless of any "presumed incapacity to look after their own affairs intelligently," *Schlesinger, supra,* 475 F.2d at 139, are not deemed "incompetent person[s]" for purposes of this rule.

B. Factors to be considered in awarding attorney's fees.

■ Having established this action as one in which the award of attorney's fees from the minors' shares of the settlement fund must be approached afresh, without regard to the fee arrangements entered into by their mother, the Court next considers the factors properly to be taken into account in determining a reasonable attorney's fee in this instance. The Court notes that

[I]n determining the amount of compensation to be paid an attorney upon a quantum meruit basis, the various factors which may be considered include the character and extent of the services and the nature of the litigation or the transaction in which they were rendered, the intricacy or difficulty of the case and of the questions and problems confronting the attorney, the novelty of the issue involved, the attorney's standing in the profession for learning, ability and integrity, as well as professional reputation and experience, or, as it has been otherwise stated, his reputation in the specialty in which he was engaged, the ability and experience required by the litigation, and the skill exercised by the attorney in handling the same, the skill and eminence of opposing counsel, the amount of money involved, the degree or amount of responsibility assumed by the attorney, the results accomplished by the attorney, that is, the benefit inuring to the client as a result of the services.

 · · · · ·

*Kaufman v. Diversified Industries, Inc.,* 356 F.Supp. 827, 831 (S.D.N.Y.1973). (For a list of factors to be considered in determining

---

**10.** Paragraph (d) of that district's Local Rule 20 provides, in pertinent part:

The Court . . . shall make an order approving . . . any settlement entered into by the proctor or attorney and the *seaman* for payment of counsel fees . . .

out of the fund created by the . . . settlement . . . ; or the Court may make such order as it deems proper, fixing counsel fees . . . .
[Emphasis supplied.]

the reasonableness of a fee, *see generally* ABA Canons of Professional Responsibility, Disciplinary Rule 2–106(B) and Rules of Professional Conduct of the State Bar of California [Cal.Ann.Bus. & Prof.Code, foll. § 6076 (1977 Supp.)], Rule 2–107(B)[11]).

Before applying the foregoing to the compromise orders under consideration, the Court notes the recent trend in certain areas of the law, notably class action public interest litigation (e. g., securities fraud, antitrust violations, employment discrimination), towards emphasizing *quantum meruit* as a basis for recovery where a common fund is produced out of which attorney's fees are to be awarded under the equitable fund doctrine. *See Lindy Bros. Builders, Inc. v. American Radiator and Sanitary Corp.*, 487 F.2d 161 (3d Cir. 1973) ["*Lindy I*"] and 540 F.2d 102 (3d Cir. 1976) ["*Lindy II*"]; *City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974) ["*Grinnell I*"] and 560 F.2d 1093 (2d Cir. 1977) ["*Grinnell II*"]; *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974).

The Ninth Circuit, while reserving the question of proper approach to the award of fees in such cases, *Vincent v. Hughes Air West, Inc.*, 557 F.2d 759, 775 n. 16 (9th Cir. 1977),[12] nevertheless has broadly suggested that once a court has determined to base a fee award not on a percentage-of-recovery but on an equitable fund basis, "[i]n determining what is a reasonable fee, the district judge might consider the factors referred to in recent cases from other circuits [citing *Lindy I, supra,* and *Johnson, supra*]." *Brandenburger v. Thompson*, 494 F.2d 885, 890 n. 7 (9th Cir. 1974).[13] District courts in this circuit have done so. *E. g., Lockheed Minority Solidarity Coalition v. Lockheed Missiles and Space Co.*, 406 F.Supp. 828, 831

**11.** Disciplinary Rule 2–106(B) provides, in pertinent part:

Factors to be considered as guides in determining the reasonableness of a fee include the following:

(1) The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly.

(2) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer.

(3) The fee customarily charged in the locality for similar legal services.

(4) The amount involved and the results obtained.

(5) The time limitations imposed by the client or by the circumstances.

(6) The nature and length of the professional relationship with the client.

(7) The experience, reputation, and ability of the lawyer or lawyers performing the services.

(8) Whether the fee is fixed or contingent.

Rule 2–107(B) provides, in pertinent part:

. . . Among the factors to be considered, where appropriate, in determining the reasonableness of a fee are the following:

(1) The novelty and difficulty of the questions involved and the skill requisite to perform the legal service properly.

(2) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer.

(3) The amount involved and the results obtained.

(4) The time limitations imposed by the client or by the circumstances.

(5) The nature and length of the professional relationship with the client.

(6) The experience, reputation, and ability of the lawyer or lawyers performing the services.

(7) Whether the fee is fixed or contingent.

(8) The time and labor required.

(9) The informed consent of the client to the fee agreement.

**12.** *Vincent,* in which actions arising out of an air crash were consolidated and a committee of plaintiffs' lead counsel appointed, involved the award of fees to lead counsel out of a special fund created by the contributions of all claimants pursuant to court order. The Ninth Circuit observed:

Because appellants [non-lead counsel objecting to the district court's orders establishing, appointing, and providing for the compensation of lead counsel] do not challenge the district court's percentage-of-the-gross-recovery approach to the award of attorneys' fees, we have no need to consider its propriety here. Our decision should not be read, however, as any approval or disapproval of that approach. [Citing, *inter alia, Grinnell I, supra*; *Lindy I, supra*; and Dawson, "Lawyers and Involuntary Clients in Public Interest Litigation," 88 Harv.L.Rev. 849, 922–30 (1975)].

557 F.2d at 775 note 16.

**13.** *Johnson,* an employment discrimination class action brought under Title VII, established a number of "guidelines" for awarding

(N.D.Cal.1976) (Title VII employment discrimination class action); *SEC v. United Financial Group, Inc.,* 404 F.Supp. 908, 912–13 (D.Or.1975) (securities fraud); *In re Gypsum Cases,* 386 F.Supp. 959, 962 (N.D.Cal. 1974) (antitrust violations). In *Gypsum,* Judge Zirpoli, citing *Brandenburger, supra,* aptly summarized many of the factors deemed noteworthy in *Johnson, Lindy,* and *Grinnell,* in emphasizing the need on the part of the district court for a

> detailed knowledge of (1) the time and labor properly employed by the attorneys in the processing of these cases; (2) the quality of the services rendered; (3) the scope of the activity and conspiracy under attack; (4) the financial risk involved and contingent nature of the action undertaken; (5) the magnitude, complexity and novelty of the issues involved; (6) the true measure of the beneficial results achieved, including the prophylactic effect thereof; and (7) the degree to which, if any, plaintiff's efforts were supported by prior governmental action.

386 F.Supp. at 962.[14]

Recovery under the equitable fund doctrine, first established in *Trustees v. Gree-*

*nough,* 105 U.S. 527, 26 L.Ed. 1157 (1882), thus viewed, closely parallels recovery in *quantum meruit*: "the individual seeking compensation has, by his actions, benefited another and seeks payment for the value of the service performed." *Lindy I, supra,* 487 F.2d at 165; *see Central RR & Banking Co. v. Pettus,* 113 U.S. 116, 5 S.Ct. 387, 28 L.Ed. 915 (1885). While *Lindy* involved the calculation of attorney's fees to be paid out of an *unrepresented* class' share of a common fund created by the activities of represented classes, the impulse similarly to treat the fees to be paid out of the minors' share of the settlement fund created on their behalf by named plaintiffs in the instant case is compelling. Although technically represented by the Patrusky firm through the latter's representation of their mother, the fact remains that minors, in the view of the law, are incapable of negotiating their own fee agreements. The only difference between their situation of conclusively presumed incapacity and that of the unrepresented class plaintiffs in *Lindy* is that the latter's failure to have negotiated a fee agreement stems not from legal incapacity

---

attorney's fees, chief among which is "time and labor required," 488 F.2d at 717. Similarly, central to the "lodestar" concept adopted in *Lindy,* an antitrust class action, is the determination of the value of attorneys' services, which determination stresses the importance of deciding, in each case, the amount to which attorneys would be entitled on the basis of an hourly rate of compensation applied to the hours worked, 487 F.2d at 167. In this regard, the reasonable hourly rate for particular activities becomes relevant: "How many hours were spent *in what manner* by which attorneys?". *Id.* [Emphasis supplied]. As the Fifth Circuit was at pains to point out:

> It is appropriate to distinguish between legal work, in the strict sense, and investigation, clerical work, compilation of facts and statistics and other work which can often be accomplished by non-lawyers but which a lawyer may do because he has no other help available. Such non-legal work may command a lesser rate. Its dollar value is not enhanced just because a lawyer does it.

488 F.2d at 717.

To be sure, factors in addition to this "lodestar" enter into the computation of reasonable attorney's fees, particularly the "contingent nature of success" and the "quality of an attorney's work," 487 F.2d at 168. Nevertheless,

the "lodestar," with its emphasis on reasonable hourly rate applied to actual hours worked, remains the key element. "This figure provides the only reasonably objective basis for valuing an attorney's services." *Id.* at 167. The application of this principle to the facts of this case will be made shortly.

With respect to the "guideline" noted in *Johnson* concerning "whether the fee is fixed or contingent," the court quoted approvingly from *Clark v. American Marine Corp.,* 320 F.Supp. 709, 711 (E.D.La.1970), aff'd, 437 F.2d 959 (5th Cir. 1971):

> [The client] might agree to pay his lawyer a percentage contingency fee that would be greater than the fee the court might ultimately set. Such arrangements should not determine the court's decision. *The criterion for the court is not what the parties agreed but what is reasonable.*

Quoted in 488 F.2d at 718 [emphasis supplied].

14. While factors (3) and (6) are peculiarly the concern of judges awarding fees in public interest litigation, as a whole the factors bear a striking resemblance to those laid down in *Kaufman, supra,* as relevant to an award of fees in *quantum meruit.* This similarity has not gone unnoticed. *See* text.

but from the fact that *in fact* they have not so done. Nonetheless, both situations furnish more than adequate impetus for court supervision.

The Court describes this development in equitable fund cases because, unlike attorneys representing plaintiff classes in such litigation (who are currently on notice of the critical importance of maintaining accurate time records even where their services are performed pursuant to contingent fee agreements), attorneys in personal injury and wrongful death cases involving the claims of minors and incompetents thus far have not been subjected expressly to what the Court views as the salutary approach of *Lindy, Grinnell, Johnson,* and their progeny.[15] Thus, in the case at bar, Mr. Patrusky's firm, whose long-standing practice has been not to maintain time records in cases, such as the present one, which the firm takes on a contingent fee basis, understandably has not maintained such records in this instance. On the other hand, where minors are involved, the Court, whose root concern and responsibility is with protecting their interests, simply cannot ignore the difficulty this poses to its efforts to grapple with the fees question.

*ATTORNEY'S FEES*

 Applying the foregoing to the proposed orders, the Court finds that three facts stand out in requiring a downward modification of the fees which would otherwise be due, owing to the contingent fee agreement. First, as alluded to briefly above, there has been an inadequate showing of the hours worked by various attorneys in the Patrusky firm at various tasks over the ten and a half months between the explosion and the lodging of the proposed orders, so as to enable the Court to proceed

confidently in *quantum meruit* under the aforementioned analysis. Second, the overwhelming majority of the work done for each of the numerous plaintiffs in this case was work done for all; there was no necessity for, nor virtually any, duplication of effort on behalf of the various plaintiffs. Third, the contingent nature of success seems to have been more a certainty than a contingency; or put another way, the risk of failure (i. e., nonrecovery) appears to have been negligible. Each of these factors will be taken up in order.

Preliminarily, the Court states that it accepts the representations of Mr. Patrusky, whose endeavors on behalf of the plaintiffs in this case have been exemplary by all appearances. Mr. Patrusky filed his Supplemental Affidavit on January 12 in an effort to supply the information requested by the Court at the conclusion of the January 9 hearing. In it he states that "thousands" of hours were spent over the past fourteen months, but that no time sheets were maintained;[16] that the four attorneys who worked on the case are Proctors of Admiralty who practice their specialty exclusively and have combined experience in excess of 65 years;[17] that various services concerning plaintiff crew members' legal documentation, hospitalization, back wages, housing, clothing and repatriation to Italy were performed by Mr. Patrusky in the aftermath of the accident;[18] that Mr. Patrusky was present at lengthy Coast Guard investigations and reviewed voluminous records generated thereby;[19] that various trips to Italy, London and Los Angeles had to be made to develop the factual record, inform families of dead and injured seamen, and undertake negotiations; that analysis of potentially adverse legal issues had to be

---

15. *See Dawson, supra* note 12. The development of the doctrines of strict products liability and comparative negligence bear on this issue through their impact in reducing the contingent nature of such litigation (i. e., reducing the risk of nonrecovery on the part of plaintiffs). Contingent nature of recovery in this case will be dealt with shortly, as it relates to the Court's determination of attorney's fees out of the minors' shares.

16. Affidavit at 13, 16–17.

17. Affidavit at 14–15.

18. Affidavit at 3–5.

19. Affidavit at 4–5.

undertaken in order to maximize plaintiff's recovery;[20] that lawsuits were commenced in New York and California; that plaintiffs' attorneys were requested to and did negotiate directly with defendants' London Insurance Representatives;[21] that plaintiff's attorneys were able to negotiate a settlement in excess of fifty percent more than that which was offered;[22] that although, due to the extraordinary geographical problems involved as well as the language barrier, many "unheralded and additional hours" had to be utilized.[23]

While it does not question any of the above recitals, nevertheless, owing to the three findings previously alluded to, which distinguish this case from the perhaps more commonplace multiple plaintiff actions, the Court finds itself constrained to reduce the amount of fees to be paid out of the minors' shares of the settlement fund below the amount that would otherwise be due under the fee agreement. It is to an application of the standards previously noted to these uncontroverted recitals, with a view to determining reasonable attorneys' fees to be paid out of those shares of the settlement fund belonging to the D'Asaro and Donnarumma minors, that the Court now turns.

A. Attorneys' time.

■ As previously noted, time spent by particular attorneys in the performance of particular activities, to which reasonable hourly rates are applied, is the focal point in fee calculations in equitable fund cases. Without detailed information the Court cannot possibly hope to undertake the desirable analysis. Although plaintiffs' attorney's inability to provide such information to the Court in this instance is in a certain sense understandable, given the facts that

(a) contingent fees continue to be the prevailing norm in seamen's personal injury and wrongful death actions, (b) attorneys performing pursuant to such fee arrangements typically do not maintain detailed (or sometimes any) time records, and (c) the approach of courts setting fees in equitable fund cases has not been adopted formally in the personal injury/wrongful death context (irrespective of the presence of minors), nevertheless this inability to provide the requested information cannot be dismissed lightly in this instance, given the facts that (a) the factors considered in calculating reasonable fees in equitable fund cases closely resemble those considered in determining fees in *quantum meruit,* (b) where minors are involved, *quantum meruit* is a favored approach of courts discharging their responsibilities to zealously safeguard the interests of minors, and (c) the Patrusky firm realized or should have realized at a very early date after their involvement in this case that minors were involved and, consequently, special considerations reflecting the solicitousness of the law for their interests were implicated, necessitating a departure from the practices routinely followed where adults only are represented.

This Court, on balance, simply cannot overlook or reward the failure of plaintiffs' attorneys in this instance, whether due to excusable inability or to inexcusable oversight, to provide the time records central to a fees calculation in *quantum meruit.* More is needed than Mr. Patrusky's general recital that "thousands" of hours were spent on behalf of *all* the plaintiffs.[24] Nowhere does his affidavit make reference to either of two potentially telling facts: (a) how many "thousands" of hours were spent on the matter—two or ten?—or (b) what

---

**20.** Affidavit at 6–7. The purportedly "novel" problems addressed by Mr. Patrusky's firm in this case concerned jurisdiction, limitation of liability, exoneration, the enforceability and effect of the employment contract under which the seamen labored, and the appropriate forum, as well as questions concerning the flag and registry of the vessel involved, its charterer and corporate owner, and the nationality of the seamen. *Id.*

**21.** Affidavit at 11–12. Mr. Patrusky states that it is his belief that this unusual occurrence was prompted by the high esteem in which his firm is held by those familiar with admiralty practice. *Id.*

**22.** Affidavit at 15.

**23.** Affidavit at 14.

**24.** Affidavit at 16.

percentage(s) of the attorneys' total time during the months involved in this case were actually spent working on it—ten or ninety? While neither, without more details, would pass muster in the equitable fund context, *see supra* note 13, at the very least such information would have provided the Court with a crude gauge against which to measure fees. Moreover, in his affidavit, Mr. Patrusky recites many varied services performed in the wake of the explosion, which he characterizes as "repatriation and aftercare" of the injured seamen and remains of the deceased.[25] While the Court extols Mr. Patrusky for the apparent energy and concern with which he performed such obviously necessary services on behalf of his clients, the fact remains that many of the services he describes required no particular legal expertise, *see supra* note 13, and that amount of, not entitlement to, fees is at issue.

Upon the record before it, the Court is unable to make the initial calculation in a *quantum meruit* award, much less undertake a determination of whether, and in what degree, the "lodestar" should be adjusted to reflect "contingent nature of success" and the "quality of an attorney's work," *Lindy I, supra,* 487 F.2d at 167–68 (*see supra* note 13).[26]

B. Duplication of services.

The Patrusky firm represents or has represented eighteen named plaintiffs in this action. When the five minors in the D'Asaro and Donnarumma families are included, the number comes to twenty-three.[27] The

Court's inquiries of Mr. Patrusky at the January 9 hearing were designed, in part, to elicit from him a recital, either in absolute or comparative terms, of hours spent for the common benefit of all plaintiffs and hours devoted to individuals or groups for their sole benefit. In his January 12 affidavit, Mr. Patrusky asserts that "[t]hough there were many plaintiffs in this matter there was no duplication of effort" and that consequently plaintiffs' attorneys focused on the problems and issues as a whole and as a result of magnifying the problems as a whole . . . were able to diffuse the substantial time and considerable effort to the various plaintiffs concerned, so that each achieved an excellent result."[28] His intimation that only by representing a large number of clients could his firm afford to devote the kind of effort necessary to achieve the "favorable" result obtained proves too much; for by no stretch of the imagination could the at best marginal additional time devoted to plaintiffs' case on behalf of the individual plaintiffs (in contrast to the time spent for their common benefit) or the extra time permitted to negotiate the best possible settlement by the fact that the Patrusky firm represented two dozen instead of, say, one or two, plaintiffs fully absorb the impact of awarding the firm a full one third of the total settlement fund to be paid on behalf of the minors. In view of the fact that the effect of the contingent fee agreements entered into between his firm and all eighteen adult plaintiffs has already or will shortly have

---

25. Affidavit at 5. These included retention of the services of an Italian interpreter, determination of and provisions for the seamen's needs regarding clothing, shelter, food, and health care, recovery and/or replacement, of documents lost on board the vessel on which the explosion occurred, determination of items lost by seamen in the explosion and the value thereof, calculation of wages due, arrangement for repatriation, identification of the deceased and notification of their families in Italy, and obtaining records and documents from various town clerks in Italy. Affidavit at 36.

26. This inability accounts for the arguably arbitrary award of fees the Court makes; but the troubling predicament in which the Court finds

itself is not of its making nor within its powers to rectify. Mr. Patrusky's recital that "[d]uring the last twenty-four months other courts of diverse jurisdictions have awarded [his] firm fees contracted for in death cases arising out of a common disaster where many minors were involved, as well as where there were surviving crew members" [Affidavit at 16] does not relieve the Court of its duty to make independent inquiry in this instance.

27. The Court has yet to be apprised of the number, if any, of minors represented by estate plaintiff Zammataro, *see supra* note 6.

28. Affidavit at 14.

likely netted plaintiffs' attorneys one third of each of eighteen settlement funds for labor that profitably could have been undertaken on behalf of a few, such an award out of the shares of the five minors before the Court would be excessive.[29] Lest it appear that hindsight prompts this conclusion, the Court next turns to the contingent nature of success in this lawsuit.

## C. Contingent nature of success.

While Mr. Patrusky lists the various legal problems to which his firm's energies and acumen were directed, *see supra* note 20, two facts in particular compel the conclusion that the risk of nonrecovery in this action was negligible or, put another way, that the contingency of success was a virtual certainty: first, defendants on two occasions (once after the explosion and again after the filing of the instant lawsuit) promptly offered to settle all claims for substantial sums;[30] and second, a fullscale investigation into the facts surrounding the explosion was undertaken by the Coast Guard.[31]

---

**29.** Were a record presented such as to enable the Court to proceed in this instance under an equitable fund approach, the Court would be inclined to follow the *pro rata* allocation principle utilized in *Lindy II, supra,* 540 F.2d 102, 119–20 (3d Cir. 1976). Under this principle, absent extraordinary circumstances, the minors would pay "a percentage of the reasonable value of the attorneys' services to the class [in this context, presumably all plaintiffs] equal to their percentage of the class' recovery." Id. at 119, quoting *Lindy I, supra,* 487 F.2d at 169. (Although silent on the point, presumably "extraordinary circumstances" might embrace the amount already recovered by attorneys from other members of the class pursuant to contingent fee agreements. *See* 540 F.2d at 121.)

In dismissing the district court's concern that to follow the rule of *pro rata* allocation might result in one subclass contributing a substantially higher percentage of their share of the settlement fund than the subclass out of whose share the Court was awarding fees based on the equitable fund doctrine (due to the existence of contingent fee contracts in the former's case), Judge Aldisert remarked:

The fee with which the court was concerned is a child of equity—not of express contract. The task before the court was to determine the fee *from the fund* to which Kohn and Berger, having rendered services that benefited all members of the settlement class, were entitled on the basis of quantum meruit. Once that fee was determined, the general rule is that it be allocated pro rata among the claimants. Private arrangements individual members of the class may have with counsel are simply irrelevant.

*Id.* at 120 [emphasis original].

Under a *pro rata* allocation, the Court first determines what would constitute a reasonable fee utilizing the standards previously discussed. In the present case, this would require the Court's calculating a reasonable fee given a total settlement of approximately $1.4 million. The Court would then assess a *pro rata* share (of the total fee to be paid) out of the minors' shares as a percentage of their respective shares of the total settlement, without regard to the percentage (33⅓) paid by other classes (in this instance, injured seamen and widows). For reasons previously discussed, the Court is unable to undertake such a calculation due to the inadequacy of the record before it.

**30.** Although defendants set up an affirmative defense in their Answer to the California action, filed May 3, 1977, at 5, to the effect that plaintiffs' action was barred by the terms of their employment contract (under which defendants were obligated to arrange for sickness and accident insurance with benefits equivalent to those applying to the Italian Merchant Navy, and were otherwise exonerated from all liability as regards sickness and accidents), and although Mr. Patrusky has stated that the maximum recovery under the terms of the contract (assuming Italian law applied) would have been $160,810—$24,000 for the injury plaintiffs and $136,810 for the estate plaintiffs [Affidavit at 9]—nevertheless two facts recited by Mr. Patrusky himself stand out in glaring contradiction to the inference that plaintiffs' attorneys did an outstanding job to obtain the recovery that they did: (a) Defendants offered $790,000 in settlement of all the claims within one month of the accident (apparently without any serious concern for the limitation of liability provision of the employment contract); and (b) when plaintiffs' attorneys rejected this early offer and filed the instant lawsuit in March, 1977, within a month again defendants offered $980,500 [Affidavit at 9–10]. The Court, not having undertaken to assume both advocates' roles and research each potential issue, cannot help but wonder just how complex the legal issues actually were, given the promptness with which defendants made, and the substantial amounts involved in, the aforementioned offers.

**31.** The Coast Guard conducted an intensive investigation of the incident which gave rise to the instant case. Consequently, rather than having had to undertake the often difficult, expensive, and time-consuming discovery activities which, if skillfully performed, prompt

Both facts, but particularly the latter, relate to the second ("the quality of services rendered") factor noted in *In re Gypsum Cases, supra,* 386 F.Supp. at 962, quoted in text, *supra* at note 14. For while the Court accepts Mr. Patrusky's recital of the vast experience the four Proctors of Admiralty who worked on this matter brought to bear on its resolution and the high regard in which his firm is held by admiralty practitioners, *see* text, *supra* at notes 17, 22, nonetheless the favorable settlement of lawsuits often turns on the skill and thoroughness with which counsel undertake discovery. Such activity by the Patrusky firm was unnecessary in this instance.

The fact of the Coast Guard investigation similarly affects this Court's application of the seventh ("the degree to which, if any, plaintiff's efforts were supported by prior governmental action") factor listed in *Gypsum. See SEC v. United Financial Group, Inc., supra,* 404 F.Supp. at 913, quoting *Wechsler v. Southeastern Properties, Inc.,* 506 F.2d 631, 635 (2d Cir. 1974):

 . . . Where, as often occurs, the private action follows upon the coattails of a government suit or investigation which has provided the basis for the claim, it has been suggested that the court's inquiry be directed at whether the services rendered played any part in achieving a successful result rather than at the encouragement of the litigation by increasing the fee through a contingency factor. [Citing *Lindy I*] . . . [A]n award of counsel fees to the "coattail" plaintiff is still recognized, the principal objection being the excessiveness of the award rather than its allowance by the court. [Citing *Grinnell I.*]

While the above suggestion is not strictly applicable to this case (the basis for plain-

tiffs' claims not necessarily having been provided by the Coast Guard investigation), the concern expressed by the Second Circuit is: plaintiffs' efforts were undeniably "supported," if not by "prior," then at least by contemporaneous, "governmental action."

The fact of prompt and substantial settlement offers by defendants—the first coming within a month of the explosion and two months prior to the filing of the instant action—informs the Court's consideration of both the fourth ("the financial risk involved and contingent nature of the action undertaken") and sixth ("the true measure of the beneficial results achieved . . .") factors cited in *Gypsum.*[32] The Court notes that, as Mr. Patrusky himself recognizes, "[i]f one evaluates the maximum offer made by defendants . . . with the final settlements obtained, it is readily determined that an amount in excess of fifty (50%) percent [sic] more than that which was offered, was obtained."[33] While some evidence of the skill with which the Patrusky firm handled the matter, viewed from the perspective of the financial risk involved and contingent nature of the action undertaken and "the true measure of the beneficial results achieved," the Court finds that the early offers themselves, as a practical matter, removed any genuine risk of nonrecovery, and that their substantiality, when compared with the final settlement amount, indicates that the true measure of beneficial results achieved by plaintiffs' attorneys approximated $445,000. Should the Court approve the proposed orders, the effect of which will be to have assisted the Patrusky firm in obtaining in excess of $452,000 in attorney's fees in what from all indicators appears to be a case of clear-cut liability,[34] the Court would be der-

settlement, the Patrusky firm had merely to attend the Coast Guard investigation and review the facts it disclosed. While this may well have been time-consuming, it hardly appears to require the kind of expertise and experience, or involve the risk of oversight, attendant upon discovery undertaken directly by adversaries.

**32.** Arguably it also bespeaks the fifth ("the magnitude, complexity and novelty of the is-

sues involved") factor, though to a lesser degree, inasmuch as defendants' willingness to settle does not necessarily evidence that such issues are not involved.

**33.** Affidavit at 15.

**34.** The Court notes that in the separate action filed by the Orgioli family to recover for the wrongful death of one of the deceased seamen,

elict in its responsibility to the minors. The entire increase in benefits achieved since the April 1977 settlement offer shortly after the filing of this action would go to the attorneys.

■ While the Court recognizes that hindsight is involved in the above analysis and wishes to emphasize that its opinion should not be construed as in any way passing on the propriety of the Patrusky firm's having originally taken on plaintiffs' case under one third contingency fee contracts, the fact nevertheless remains that in determining reasonable fees for services performed on behalf of the minors, the proper temporal focus is the present; and thus hindsight is indeed proper. As previously noted, the Court in valuing the attorneys' services in *quantum meruit* ignores the contingent fee agreement; and *a fortiori*, the Court does not attempt to assess *its* reasonableness at the time entered into. Such matters are simply irrelevant to the proper discharge of the Court's responsibility in such matters.

## CONCLUSION

For reasons heretofore stated, finding that those portions of the D'Asaro and Donnarumma proposed compromise orders relating to the settlement and release of claims brought by plaintiffs Franca D'Asaro and Elvira Cacace Donnarumma in their respective individual capacities and the Scarogni proposed compromise order in its entirety are not properly before this Court for review and approval under any statute or law applicable to, or any rule or practice of, this Court, and no incapacity on the part of Franca D'Asaro, Elvira Cacace Donnarumma, or Lisa Scarogni so to settle and release claims brought in their own behalf having been alleged or shown, the Court declines to so approve or disapprove such proposed compromise orders or portions thereof.

defendants have admitted liability, again without any evidence of independent discovery hav-

## ORDER

For reasons heretofore stated, the Court, having reviewed the proposed compromise orders and having found that those portions of the D'Asara and Donnarumma proposed compromise orders relating to the settlement and release of the claims brought by plaintiff Franca D'Asaro on behalf of the minors Paolo D'Asaro, Antonio D'Asaro, and Calogero D'Asaro and by plaintiff Elvira Cacace Donnarumma on behalf of the minors Vincenzo Donnarumma and Michele Donnarumma are fair and reasonable and in accord with provisions of law,

IT IS HEREBY ORDERED that Franca D'Asaro be and is hereby authorized and permitted to compromise and settle the claims of her aforementioned minor children arising from the death of their father Calogero D'Asaro for the sum of $142,417.00; and

IT IS FURTHER ORDERED that Franca D'Asaro be and hereby is authorized and empowered to execute and deliver a general release to the defendants herein so as to conclude the entire claim of the aforementioned minors; and

IT IS FURTHER ORDERED that the sum of $32,419.08 be paid to the order of Franca D'Asaro jointly with an officer of the First National City Bank located at Foley Square, in the City of New York, State of New York, to be deposited in trust for the infant Paolo D'Asaro, said account to draw interest for the benefit of said infant, with the interest as earned to be transmitted quarterly directly to Franca D'Asaro for the use and benefit of the said infant and that no other funds be withdrawn from said account without further order of this Court; and

IT IS FURTHER ORDERED that the sum of $43,871.69 be paid to the order of Franca D'Asaro jointly with an officer of the First National City Bank, located at Foley Square in the City of New York, State of New York, to be deposited in trust for the infant Antonio D'Asaro, said

ing been necessary on the part of plaintiffs' attorneys on that issue. *See supra* note 4.

account to draw interest for the benefit of said infant, with the interest as earned to be transmitted quarterly directly to Franca D'Asaro for the use and benefit of said infant and that no other funds be withdrawn from said account without further order of this Court; and

IT IS FURTHER ORDERED that the sum of $44,763.68 be paid to the order of Franca D'Asaro jointly with an officer of the First National City Bank, located at Foley Square in the City of New York, State of New York, to be deposited in trust for the infant Calogero D'Asaro, said account to draw interest for the benefit of said infant, with the interest as earned to be transmitted quarterly directly to Franca D'Asaro for the use and benefit of said infant and that no other funds be withdrawn from said account without further order of this Court; and

IT IS FURTHER ORDERED that out of said sum of $142,417.00, the defendants pay a total of fifteen percent (15%), or $21,362.55 to the order of Semel, Patrusky & Buchsbaum as reasonable attorney's fees for services rendered on behalf of said minors; and

IT IS HEREBY ORDERED that Elvira Cacace Donnarumma be and is hereby authorized and permitted to compromise and settle the claims of her aforementioned minor children arising from the death of their father, Antonio Donnarumma, for the sum of $171,570.09; and

IT IS FURTHER ORDERED that Elvira Cacace Donnarumma be and hereby is authorized and empowered to execute and deliver a general release to the defendants herein so as to conclude the entire claim of the aforementioned minors; and

IT IS FURTHER ORDERED that the sum of $75,442.16 be paid to the order of Elvira Cacace Donnarumma jointly with an officer of the First National City Bank located at Foley Square, City of New York, State of New York, to be deposited in trust for the infant, Vincenzo Donnarumma, said account to draw interest for the benefit of said infant, with the interest as earned to be transmitted quarterly directly to Elvira Cacace Donnarumma for the use and benefit of the said infant and that no other funds be withdrawn from said account without further order of this Court; and

IT IS FURTHER ORDERED that the sum of $70,592.41 be paid to the order of Elvira Cacace Donnarumma jointly with an officer of the First National City Bank located at Foley Square, City of New York, State of New York, to be deposited in trust for the infant, Michele Donnarumma, said account to draw interest for the benefit of said infant, with the interest as earned to be transmitted quarterly directly to Elvira Cacace Donnarumma for the use and benefit of the said infant and that no other funds be withdrawn from said account without further order of this Court; and

IT IS FURTHER ORDERED that out of said sum of $171,570.09, the defendants pay a total of fifteen percent (15%), or $25,535.52 to the order of Semel, Patrusky & Buchsbaum as reasonable attorney's fees for services rendered on behalf of said minors.