**In re CAPITAL UNDERWRITERS, INC. SECURITIES LITIGATION.**

**No. MDL 356 WHO.**

United States District Court,
N. D. California.

May 5, 1981.

James A. Wagner, Honolulu, Hawaii, for F. B. Carter, III, Receiver, Civ. Nos. 75–298, 75–298(1), 78–0518, and 77–0028.

Leroy V. Amen, Securities & Exchange Commission, San Francisco, Cal., for Securities & Exchange Commission, Civ. No. 75–298.

John Marshall Collins, Decker & Collins, San Jose, Cal., for Gary L. DiGirolamo and Bonnie L. DiGirolamo, Civ. No. 77–0028.

Robert L. Lieff, Sonoma, Cal., Jonathan J. Wilcox, San Francisco, Cal., for Rema Class Plaintiffs in Civ. No. 79–0784, Class V in the Cal-Hawaii Action, Civ. No. 75–298(1), and Non-Papakea Investors in Carter II Action, Civ. No. 75–0518.

George P. Eshoo, Eshoo, Scott & Saloman, Redwood City, Cal., for settling defendants California-Hawaii Development,

Inc., Dewey O. Chapman, Betty Jane Chapman, and George P. Eshoo.

Peter J. Benvenutti, John F. Taylor, San Francisco, Cal., for intervening plaintiff Community Elec. in Carter II, Civ. No. 78–0518.

Thomas S. DiBiasi, Citrino, Balsam & DiBiasi, Nutley, N. J., Paul E. DiBianco, Honolulu, Hawaii, for intervening plaintiff Corral, et al., in Carter II, Civ. No. 78–0518.

Kenneth M. Christison, San Francisco, Cal., for settling defendant Gery Gomez.

Theodore G. Meeker, Honolulu, Hawaii, for certain Class VI Creditors in the Cal-Hawaii Action, Civ. No. 75–298(1).

Charles J. Quantz, San Francisco, Cal., for Mendelsohn, Civ. A. No. C 75 1259 WHO.

Harold J. Cassidy, Jersey City, N.J., for settling defendants J. V. Development and Vernon Luke.

Jerome Sapiro, Jr., San Francisco, Cal., for settling defendant John L. Susott.

Samuel A. Keesal, Keesal, Young & Logan, Long Beach, Cal., for settling defendants Carlsmith, Carlsmith, Wichman & Case, George C. Grubb, and James W. Boyle.

Auban A. Eisenhardt, Petty, Andres, Tufts & Jackson, San Francisco, Cal., for settling defendants Mattoch, Edmund & Kemper, Mattoch, Edmunds & Brown, Mattoch, Edmunds, Kemper & Brown, Kemper & Watts, and Edward C. Kemper, III.

Robert H. Jaffe, Springfield, N.J., for plaintiffs in Jala I and Jala II in Civ. Nos. 77–0554 and 77–0665.

Jeffrey Barton Cahn, Newark, N.J., for settling plaintiffs in Jala II, Civ. No. 77–0665 and Alice Y. Johnson in Civ. Nos. 77–0054 and 77–0867.

James E. Cooke, Cooke & Macke, San Francisco, Cal., for class action plaintiffs except Harold Wheeler in Civ. A. No. C 78 1737 WHO, for the McDonald Class Action plaintiffs in Civ. A. No. C 76 1492 RHS, and for the Mendelsohn Class Action plaintiffs, except Paul Mendelsohn, in Civ. A. No. C 75 1259 WHO.

Stephen N. Dratch, Roseland, N.J., for defendants Benjamin Rabin, et al. and Washington Capital Corp.

John B. Bates, Patrick J. Mahoney, San Francisco, Cal., for defendants Harris, Kerr, Forster & Co., David E. Latham, Robert Nakama, Stanley Wachi, Gary Kuioko, and Ronald K. Watase.

William J. Keegan, San Francisco, Cal., for settling defendants Honokowai-Papakea Joint Venture, H–K Partners, Ernest C. Hickson, John J. Stanford, James K. Schuler, Thomas F. Burgess, James K. Schuler, Thomas F. Burgess, James K. Schuler & Assoc., Inc., George L. Campos, E. W. Gordon, and Carrington P. Y. Wong.

Patrick E. Catalano, San Francisco, Cal., for defendant Deluchi, Swanson & Sandoval.

Michael J. Murphy, San Francisco, Cal., for defendant Michael Y. Ichikawa.

F. B. Carter, III, receiver.

## OPINION

ORRICK, District Judge.

Counsel for the class of plaintiff investors in this multidistrict ("MDL") securities action have submitted petitions for attorneys' fees and costs totaling over $1 million, to be paid out of a settlement fund of $1.75 million. Applying the standards of review listed in *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 70 (9th Cir. 1975), *cert. denied*, 425 U.S. 951, 96 S.Ct. 1726, 48 L.Ed.2d 195 (1976), within the framework first delineated in *Lindy Bros. Builders, Inc. v. American Radiator & Sanitary Corp.*, 487 F.2d 161 (3d Cir. 1973) (hereinafter cited as *"Lindy I"*), this Court has eliminated substantial amounts from the requested fees for services that provided no apparent benefit to the plaintiff class. The Court herein awards fees totaling $478,433 and costs of $80,784, amounts in keeping with the estimates of attorneys' fees and costs provided in the notice of proposed settlement received by each class member prior to the Court's approval of this settlement.

## I

On December 19, 1980, this Court declared a proposed settlement agreement between all plaintiffs and the major defendants in this multidistrict litigation to be fair, reasonable, and adequate. *See* Order filed February 11, 1981. The Court subsequently determined the merits of a number of claims for payment from the fund provided by settling defendants pursuant to the agreement, and issued final orders approving the settlement agreement and establishing a final list of claimants to the settlement fund. The final prerequisite to the distribution of the settlement fund is a determination of the proper amount of fees and costs to be awarded to plaintiffs' counsel. Before assessing the fee petitions filed by counsel in this action, a brief review of the major actions comprising this litigation is in order.

## A

This litigation arose from the actions of one Gary DiGirolamo who was president of Capital Underwriters, Inc. ("CU"), and who sold and arranged for the sale of interests in limited partnerships to finance real estate developments in Hawaii. These interests were marketed by officers of CU and by a network of brokers in California and New Jersey. In 1975, DiGirolamo and CU were sued by the Securities and Exchange Commission ("SEC") for violations of security laws based on misrepresentations to investors and misapplications of investors' funds. The SEC suit was followed by a variety of civil actions brought by and on behalf of purchasers of limited partnership interests in CU's condominium projects. *Mendelsohn v. Capital Underwriters, Inc.*, 490 F.Supp. 1069 (N.D.Cal.1975), the first action brought by investors, was filed against defendants DiGirolamo, CU, and related entities. The suit charged CU and its officers with two forms of fraudulent conduct. First, CU was alleged to have marketed interests in legitimate projects that were being developed by another company, and then commingled the money received from these investors with the corporate funds of CU, where they were used in part for DiGirolamo's personal expenses. Second, CU allegedly sold interests in projects that were being developed by CU but raised more money than was required to fund the projects.

A second action, *McDonald v. Capital Underwriters, Inc.*, 490 F.Supp. 1069 (N.D.Cal. 1976), was brought on behalf of eight other named individuals who were purchasers of interests in seven different limited partnerships, and expanded the defendants in the action to include several law firms and an accounting firm that had provided professional services to CU and who allegedly participated in DiGirolamo's fraudulent scheme. The *McDonald* plaintiffs were represented by the same counsel who represented the *Mendelsohn* plaintiffs, the law firm of Quantz & Cerny.

In December, 1978, in response to concern expressed by this Court regarding a potential conflict in Quantz & Cerny's representation of plaintiff Mendelsohn and other plaintiffs, that firm withdrew in favor of new counsel, Cooke & Macke. On April 20, 1979, this Court granted three motions for summary judgment brought by the professional defendants in the *Mendelsohn* and *McDonald* actions, and stated its conclusions more fully in a written opinion filed on October 26, 1979. *Mendelsohn v. Capital Underwriters, Inc.*, 490 F.Supp. 1069, 1979–80 Transfer Binder, CCH Fed.Sec.L.Rep. ¶ 97,169. In that opinion, this Court found that the accounting firm could not be held liable for aiding and abetting the alleged securities law violations of CU, and found no material issue of fact as to lack of knowledge of the alleged fraudulent scheme by the legal professional defendants.

A third action on behalf of investors in limited partnership interests, *Wheeler v. Capital Underwriters, Inc.*, No. C–78–1737 WHO (N.D.Cal., filed Aug. 2, 1978), was filed by the Quantz & Cerny firm and was the object of summary judgment motions by the professional defendants at the time of settlement.

## B

The second major set of actions filed in this litigation were the companion cases of *Jala v. DiGirolamo*, No. 77–0554 (D.N.J., filed Mar. 22, 1977), transferred to this district, No. C–79–0153 WHO (N.D.Cal., filed Jan. 25, 1979), in which the Jalas sought relief individually for losses sustained for the purchase of a debenture from a CU subsidiary, and *Jala v. DiGirolamo*, No. 77–0665 (D.N.J., filed Apr. 7, 1977), transferred to this district, No. C–79–0152 WHO (N.D. Cal., filed Jan. 25, 1979), in which the Jalas sought to represent persons similarly situated who sustained a loss as a result of the purchase of limited partnership interests in the CU condominium project, Makiki Cliffs. The *Jala* cases were initially consolidated for trial in New Jersey, and survived motions to dismiss in that court based on the statute of limitations. *See* Order of Judge Fischer, filed Mar. 20, 1978. After transfer to this Court pursuant to the order of the Judicial Panel for Multidistrict Litigation on January 18, 1979, the *Jala* plaintiffs filed an amended complaint expanding the plaintiff class to include claims by named plaintiffs with respect to investments made in three other condominium projects. At the time of settlement, various motions to dismiss by the professional defendants and a motion for class certification by the *Jala* plaintiffs were pending before the Court. The *Jala* plaintiffs were represented at all times by the law firm of Robert H. Jaffe, P.A.[1]

## C

The third major set of actions in this litigation was brought in Hawaii by the Receiver appointed to marshal the assets of CU in the 1975 SEC civil action against DiGirolamo and CU. In *Receiver v. DiGirolamo*, No. C–79–0155 WHO (N.D.Cal., filed Jan. 25, 1979), the Receiver sought recovery on behalf of the receivership corporations of assets allegedly misappropriated by DiGirolamo and other officers. A second action, *Receiver v. Honokowai-Papakea Joint Venture*, No. C–78–0518 WHO (N.D.Cal., filed June 16, 1980) (hereinafter cited as the "*Honokowai* action"), sought an accounting by the joint venture that actually constructed the only successful CU project, Papakea, of profits from that project, and of additional lost profits owed to Papakea investors due to overselling the project.[2] At the time the settlement agreement was reached, objections to the transfer of the *Honokowai* action had prevented its consolidation with the MDL cases, although defendants in that action participated informally in this MDL action for some time before settlement was agreed upon. At all times, the Receiver was represented in these actions by the law firm of Gelber & Wagner.

## D

The fourth set of major plaintiffs in this litigation, the *Rema* plaintiffs, filed a class action in this Court on behalf of investors in projects other than the successful development at Papakea. *Rema v. Carlsmith, Carlsmith, Wichman & Case*, No. C–79–0784 WHO (N.D.Cal., filed Apr. 6, 1979). As in the *Jala* actions, the *Rema* plaintiffs immediately faced motions for dismissal and summary judgment related to the statute of limitations and strong opposition to their own motion for class certification, all of which were pending at the time of settlement. The *Rema* class action also faced a substantial defense of collateral estoppel based on this Court's grant of summary judgment in the *Mendelsohn/McDonald* actions. Apart from this class action, the attorneys for the *Rema* class, Robert Lieff

---

1. A second action filed in a New Jersey district court, *Johnson v. Capital Underwriters, Inc.*, also was consolidated in MDL 356. Counsel in that action, Jeffrey Barton Cahn of the law firm of Sills, Beck, Cummis, Rodin & Tischman, acted thereafter as co-counsel with Mr. Jaffe for the *Jala* plaintiffs. *See* affidavit of Jeffrey Cahn, ¶ 5.

2. In a similar action in Hawaii that was not part of the MDL proceedings, the Receiver brought an interpleader action, *F. B. Carter III v. California-Hawaii Development, Inc.*, No. 75–298(1) (D. Hawaii) (hereinafter referred to as "the Hawaiian interpleader"), which resulted in the distribution of $3.1 million in profits to investors.

and Jonathan Wilcox, also intervened in the Receiver's *Honokowai* action, seeking recovery of non-Papakea investors' claims on a theory of commingling that had proven successful previously in the Hawaiian interpleader action. Negotiations among the *Rema* counsel, the Receiver's counsel, and counsel for the *Honokowai* defendants resulted in an end to objections to consolidation of the *Honokowai* action with this litigation and the contribution of an additional $750,000 to the settlement fund in this action.

### E

The negotiations that ultimately led to this "global" settlement proceeded through at least six discernible stages. In November, 1979, attorneys Cooke and Jaffe, acting on behalf of the *Wheeler* and *Jala* investors, broached the possibility of a $270,000 settlement with one of the legal professional defendants. By March, 1980, this agreement had grown to a $550,000 settlement that also included the Receiver and *Rema* plaintiffs, but objections by other professional defendants prevented the conclusion of an agreement at this point. In July, 1980, a $1 million settlement involving all settling defendants, except the defendants in the *Honokowai* action, appeared imminent. The proposed fund would have compensated all plaintiffs represented in the proposed *Jala* class in the amounts sought by counsel.[3] Counsel for the *Jala* plaintiffs, however, sought a 100 percent recovery for the class representatives and refused to settle. On September 19, 1980, another hearing was held at which a partial settlement of $1 million was discussed, and that agreement was confirmed on October 3, 1980, by all settling plaintiffs and defendants with the exception of *Jala* counsel who again balked at signing due to the individual requirements of his named plaintiffs.[4] Finally, on October 17, 1980, a "global" settlement agreement was reached which included not only all active claims against defendants by plaintiffs in this action but also plaintiffs' claims in the *Honokowai* action.

The October 17, 1980, settlement agreement, which was ultimately approved by this Court on December 19, 1980, as fair, adequate, and reasonable within the standards of *Mandujano v. Basic Vegetable Products, Inc.*, 541 F.2d 832 (9th Cir. 1976), provided for the creation of a settlement fund of $1,750,000. The agreement also established six subclasses of investors and creditors among whom the fund would be distributed, and provided a formula for distribution among these groups. The agreement further provided for the payment of attorneys' fees and costs, although the notice of proposed settlement sent to each class member indicated, at Part D(2), page 12, that such fees would total no more than $500,000 while costs, including those incurred in distributing the fund, would be limited to $100,000.

### II

■ The power of this Court to award attorneys' fees in this action, where such fees are not based on a statutory right, is grounded on the equitable power of the Court to recapture the unjust enrichment of persons benefiting from this action without bearing the cost of it. Traditionally, each party in American courts has been required to bear his own attorney's fees. *See Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 247, 95 S.Ct. 1612, 1616, 44 L.Ed.2d 141 (1975). An exception to this rule has long been recognized in equity, however, which provides that "a private plaintiff, or his attorney, whose efforts create, discover, increase, or preserve a fund to which others also have a claim is entitled to recover from the fund the costs of his litigation, including attorneys' fees." *Vincent v. Hughes Air West, Inc.*, 557 F.2d 759, 769 (9th Cir. 1977). This exception, known as the Common Fund Doctrine, is firmly rooted in American case law, *see Trustees v. Greenough*, 105 U.S. 527, 26 L.Ed. 1157 (1881); *Central Railroad & Banking Co. v. Pettus*, 113 U.S. 116, 5 S.Ct. 387, 28 L.Ed.

---

3. R.T., July 11, 1980, at 17.

4. R.T., October 3, 1980, at 25.

915 (1885), and is directly applicable to the facts of this case where the efforts of a number of representative CU investors and their counsel have resulted in the creation of a substantial fund of money for distribution to all investors in CU projects affected by the alleged fraudulent conduct of that company and its officers and agents.

█ In exercising its equitable power to award attorneys' fees for the creation of a common fund, however, the Court acts as the guardian of the rights of absent class members, *Grunin v. International House of Pancakes,* 513 F.2d 114, 123 (8th Cir. 1975), *cert. denied,* 423 U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975); *In re Equity Funding Corp. Securities Litigation,* 438 F.Supp. 1303, 1325 (C.D.Cal.1977), since the portion of the fund allocated to attorneys' fees will obviously not be available to remedy the substantive wrongs for which the fund was created. Excessive fees have a broader detrimental effect as well on the continued usefulness of the class action mechanism since such awards provoke criticism of the legal profession and class representation in particular. The Court thus must act to avoid even the appearance of creating a windfall for counsel to the prevailing party. *Detroit v. Grinnell Corp.,* 495 F.2d 448, 469 (2d Cir. 1974) (hereinafter cited as *"Grinnell I"*).

While the Court should exercise moderation in awarding attorneys' fees, *id.* at 469–70, it must also bear in mind the need to adequately compensate attorneys for the value of their services to the class in light of "the policy of the law in class actions * * to provide a motive to private counsel to represent consumers and enforce the laws." 1 Moore's Federal Practice, Manual for Complex Litigation § 1.47 at 78 n.127 (1980). In doing so, however, the Court should also consider that the opportunity to represent the class, on which the fee petition is based, is one created not by the enterprise of counsel alone, but by a judicial determination. Furthermore, it involves an element of public service which counsel should recognize at the time they seek to represent a class. *Id.* The Manual aptly summarizes these competing concerns:

"The guiding principles in determining awards of attorneys' fees should be to provide compensation sufficient to stimulate the motive for representation of classes and to ensure that the fees awarded are consistent with the degree of benefits bestowed upon the class insofar as the bestowing of those benefits can be shown to be the product of the lawyer's work." *Id.*

Several approaches have been developed for applying these policy considerations to particular fee petitions. Until recently many courts calculated attorneys' fees as a percentage of the amount of recovery represented by the settlement fund, and this method continues to be used as the whole or partial basis for calculating fees by some courts. *See, e. g., In re Montgomery County Real Estate Antitrust Litigation,* 83 F.R.D. 305, 323 (D.Md.1979) (justifying an award of fees in part by reference to percentage of recovery); *In re Scientific Control Corp.,* 80 F.R.D. 237, 244 (S.D.N.Y.1978) (basing calculation of award in part on percentage of recovery).

A more recently developed approach involves the calculation of a "lodestar" figure based on the number of hours expended by counsel multiplied by the prevailing rate per hour for similar legal services in the community, taking into account counsel's reputation and status, with subsequent adjustment based on the quality and risk involved in the counsel's efforts. While first suggested by the Third Circuit in *Lindy I* and *Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.,* 540 F.2d 102 (3d Cir. 1976) (hereinafter cited as *"Lindy II"*), the "lodestar" approach has been quickly adopted in other circuits as well. *See, e. g., Furtado v. Bishop,* 635 F.2d 915 (1st Cir. 1980); *Grinnell I; Detroit v. Grinnell Corp.,* 560 F.2d 1093 (2d Cir. 1977) (hereinafter cited as *"Grinnell II"*); *Copeland v. Marshall,* 641 F.2d 880 (D.C.Cir.1980) (en banc).

An alternative to the "lodestar" approach is embodied in the more loosely structured factors for consideration outlined in Disci-

plinary Rule 2–106(B) of the American Bar Association's Code of Professional Responsibility, and initially applied in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir. 1974).[5]

While the approach most clearly adopted by the Ninth Circuit is consideration of the factors listed in *Johnson, see Kerr*, 526 F.2d at 70, other Ninth Circuit decisions both before and after the *Kerr* opinion have suggested consideration of the "lodestar" approach as well. *See Vincent*, 557 F.2d at 775 n.16; *Brandenburger v. Thompson*, 494 F.2d 885, 890 n.7 (9th Cir. 1974); *see also In re Gypsum Cases*, 386 F.Supp. 959, 962 (N.D.Cal.1974), *aff'd* 565 F.2d 1123 (9th Cir. 1977). Although the Ninth Circuit has not expressly rejected the percentage approach to calculating fees, *see Vincent*, 557 F.2d at 775 n.16, that approach has been criticized by other courts in the circuit and appears inconsistent with the more detailed analysis based on application of the *Johnson* factors that was mandated in *Kerr*. *See, e. g., In re Equity Funding Corp. of America Securities Litigation*, 438 F.Supp. 1303, 1326 (C.D. Cal.1977) (expressly rejecting the percentage approach); *Gypsum Cases*, 386 F.Supp. at 962; *see also* Comment, 60 Cal.L.Rev. 1656, 1669–70 (1972) (noting that percentage approach offers an insufficient motive to prosecute in cases involving important precedent but low monetary recovery).

Both the lodestar and *Johnson* approaches have been substantially criticized by courts and commentators. As one commentator has noted, the emphasis that is placed by the lodestar approach on the number of hours expended is an unsure measure of the quality of services, 3 Newberg, Class Ac-

tions § 6935, since long hours may indicate complex issues or vigorous opposition, or may simply reflect duplication of work, inefficiency of prosecution, or poor timekeeping records. Strict attempts to apply the *Johnson* factors have also been criticized as being insufficient to guarantee a rational setting of fees. Courts and commentators have noted the existence of redundancy among the factors. *See, e. g., Copeland*, at 890;[6] *Zurcher v. Stanford Daily, Inc.*, 64 F.R.D. 680, 682 (N.D.Cal.1974), *aff'd*, 550 F.2d 464 (1977), *reversed on other grounds*, 436 U.S. 547, 98 S.Ct. 1970, 56 L.Ed.2d 525 (1978); Berger, "Court Awarded Attorney's Fees: What is 'Reasonable'?", 126 U.Pa.L. Rev. 281, 286–87 (1976). More important, the factors by themselves lack a framework for application. As one commentator has noted, the *Johnson* approach "offers no guidance on the relative importance of each factor, whether they are to be applied differently in different contexts, or indeed, how they are to be applied at all." Berger, *supra*, at 286–87.

District courts in the Ninth Circuit have responded to these weaknesses in the *Johnson* approach by blending the *Johnson* and lodestar approaches in several different ways. One method of consolidating the approaches, exemplified in *Keith v. Volpe*, 86 F.R.D. 565, 573–77 (C.D.Cal.1980), is to discuss the appropriate *Johnson* factors and then use the *Lindy* procedure to calculate the number of hours and augment or decrease the amount. In the absence of a link between the discussion of the *Johnson* factors and the lodestar calculations, however, it is not clear what weight is given to which *Johnson* factors and from what basis the actual fees awarded were derived.

**5.** As listed in *Johnson*, the twelve factors are: the time and labor required; the novelty and difficulty of the questions; the skill requisite to perform the legal services properly; the preclusion of other employment due to acceptance of the case; the customary fee; the contingent or fixed nature of the fee; the time limitations imposed by the client or the case; the amount involved and the results obtained; the experience, reputation, and ability of the attorneys; the "undesirability" of the case; the nature of the professional relationship with the client; and awards in similar cases.

**6.** The Copeland opinion noted, for example, that a consideration of the "difficulty of the questions" should be subsumed under "time and labor required," while factors concerning the level of skill required for the services, the fixed or contingent nature of the fee, time limitations, the amount to be obtained, the reputation of counsel, and the undesirability of the case, are all elements to be considered in setting the customary hourly fee. *Copeland v. Marshall*, 641 F.2d 880, 890 (D.C.Cir.1980) (en banc).

Other courts have blended the two approaches by viewing them as "generally complementary" and using the *Lindy I* approach as "a procedure for ordering the examination of factors listed in *Johnson.*" *Knutson v. Daily Review, Inc.,* 479 F.Supp. 1263, 1270 n.10 (N.D.Cal.1979) (quoting *Zurcher,* 64 F.R.D. at 682); *see, e. g., Equity Funding,* 438 F.Supp. at 1326; *Donnarumma v. Barracuda Tanker Corp.,* 79 F.R.D. 455 (C.D.Cal.1978); *Lockheed Minority Solidarity Coalition v. Lockheed Missiles & Space Co.,* 406 F.Supp. 828 (N.D.Cal. 1976); *Zurcher,* 64 F.R.D. at 682. These cases generally begin by equating the first factor in the lodestar approach, "hours spent," with the "time and labor required" element of *Johnson. See, e. g., Donnarumma,* 79 F.R.D. at 462 n.13 (describing "time and labor" as the chief guideline in *Johnson* ), then consider other *Johnson* factors in setting the hourly rate and determining whether to augment or decrease the award based on quality or contingency considerations.[7]

The *Johnson* factors and lodestar approach do appear to be largely complementary. While the *Johnson* factors give more overt consideration to the results obtained in the litigation,[8] the benefits produced by the litigation also are a factor to be considered in the lodestar analysis, particularly in considering whether to augment or decrease the lodestar figure by a multiplier based on the quality of counsel's work. *Lindy II,* 540 F.2d at 118.[9] At least one post-*Lindy* decision also has suggested an addition to the *Lindy* procedure allowing an adjustment to the lodestar to assure the reasonableness of the ultimate award, taking into account the amount received by the class. *Hughes v. Repko,* 578 F.2d 483, 490– 92 (3d Cir. 1978). Such an adjustment based on the low amount of benefit conferred on the class was made by Judge Renfrew of this district in *Knutson,* 479 F.Supp. at 1270–71, 1278.

█ This Court thus concurs with the reasoning of those decisions utilizing the *Johnson* factors within a *Lindy* procedure, and concludes that nothing in the Ninth Circuit's mandate to consider the *Johnson* factors, nor anything in the *Lindy* procedures, contradicts such an approach.

### III

In considering the petitions filed in this action, the Court faces a relatively unique problem since plaintiffs' counsel have in effect agreed to a ceiling on attorneys' fees and costs[10] but have filed petitions for

---

7. The *Equity Funding* opinion most clearly exemplifies this approach. In determining the number of hours to be credited to counsel, the court considered the possibility of duplicative or unnecessarily extended efforts based on the court's own knowledge of the time expended, and also deducted hours spent on effort that did not benefit the class as a whole. *In re Equity Corp. Securities Litigation,* 438 F.Supp. 1303, 1328 (C.D.Cal.1977). In setting the hourly rate, the court considered preclusion of other employment and the customary fee for similar services in the community. *Id.* at 1329–30. In weighing the "risk factor, the court took into account the contingent nature of the case, the difficulty of plaintiffs' burden in arguing complex or novel issues, and delay in receipt of payment by the counsel. *Id.* at 1331–36. Finally, in determining the quality factor, the court included its assessment of the quality of work before it, the novelty and complexity of the issues, the monetary amount achieved, and the experience and reputation of counsel at the bar. *Id.* at 1336–37.

8. *Johnson* factor number 8 explicitly mandates consideration of the "amount involved and results obtained." *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 718 (5th Cir. 1974).

9. The *Lindy II* decision countenanced consideration of the result obtained in terms of "(a) the potential money damages available to the class member, *i. e.,* a comparison of the extent of possible recovery with the amount of actual verdict or settlement; (b) the benefit—monetary or non-monetary—conferred on the class * * *." *Lindy II,* 540 F.2d 102, 118 (3d Cir. 1976), *quoting Merola v. Atlantic Richfield Co.,* 515 F.2d 165, 168 (3d Cir. 1975).

10. While the estimate of attorneys' fees and costs appeared in the notice of proposed settlement rather than the settlement itself, this Court believes itself duty bound in its role as guardian of the interests of absent class members, *Grunin v. International House of Pancakes,* 513 F.2d 114 (8th Cir. 1975), *cert. denied,* 423 U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975), to adhere as closely to that ceiling as possible, since absent class members may well

more than twice the amount of the self-imposed ceiling. The Court is troubled by this incredible discrepancy between the estimated amount of fees and the amount actually requested, and can only conclude that some plaintiffs' counsel have once again validated the truth of the Italian proverb that "a lawsuit is a fruit tree planted in a lawyer's garden." *Grinnell I*, 495 F.2d at 469. The massive amount by which the requested fees exceed the estimate provided to class members introduces a new dynamic into the determination of fee awards, for the Court, in fulfilling its equitable role in this decision, must act not only to protect the interests of absent class members, but also the interests of those counsel whose efforts clearly benefited the class members' interests. It is the responsibility of the Court, in the exercise of its discretion, to set attorneys' fees. *Gluck v. American Protection Industries*, 619 F.2d 30, 32 (9th Cir. 1980). In carrying out the responsibility, however, the Court cannot simply make a pro rata reduction in fees to attain the estimated ceiling, but is instead required to and will make findings of fact and conclusions of law regarding the appropriate *Johnson* factors. *Id.; Fountila v. Carter*, 571 F.2d 487, 496–97 (9th Cir. 1978). *See also Seymour v. Hull & Moreland Engineering Co.*, 605 F.2d 1105, 1116–17 (9th Cir. 1979); *In re Penn Central Securities Litigation*, 416 F.Supp. 907, 913–14 (E.D.Pa.1976), *reversed on other grounds*, 560 F.2d 1138 (3d Cir. 1977) (noting a similar misestimate of attorneys' fees in the notice to the class, but applying a full lodestar analysis).

■ The problem faced by this Court in assessing these petitions, then, is to reduce the requested fees by more than 50 percent while adhering to the standards mandated in this circuit by *Kerr*. The Court has approached this task mindful of the fundamental importance of the element of benefit to class members that is the source of its power to award fees in this action. *See*

*Trustees v. Greenough; Vincent*, 557 F.2d at 769. As noted in *Altman v. Central of Georgia Ry. Co.*, 580 F.2d 659, 661 (D.C.Cir. 1978): "The crucial question in determining the amount of the fees to be awarded * * * was what portion of [counsel's] work could properly be deemed productive of that benefit, the creation of which was the basis of their being awarded a fee." Thus, in calculating the initial factor of time and labor expended, the Court has considered not only such factors as duplicative effort, *see, e. g., Equity Funding*, 438 F.Supp. at 1328; *Waters v. Heublein, Inc.*, 485 F.Supp. 110, 112–13 (N.D.Cal.1979), and vagueness or inaccuracy in recordkeeping, *see, e. g., Donnarumma*, 79 F.R.D. at 465; *Lockheed Minority Solidarity Coalition*, 406 F.Supp. at 831, but has also deducted time expended on behalf of the claims of individual clients rather than the class as a whole, *e. g., Equity Funding*, 438 F.Supp. at 1328, 1344; *In re Armored Car Litigation*, 472 F.Supp. 1357, 1387 (N.D.Cal.1979), and time expended on issues or motions that failed to produce a benefit to the class, *Altman*, 580 F.2d at 661. *See also Sethy v. Alameda County Water District*, 602 F.2d 894, 898 (9th Cir. 1979) (awarding fees based on work on issues on which plaintiffs succeeded); *Penn Central*, 416 F.Supp. at 917, 923; *Seigal v. Merrick*, 1979–80 Transfer Binder, CCH Federal Sec.L.Rep. ¶ 96,867 (S.D.N.Y. 1979) (efforts expended on nonmeritorious legal theories discounted). While the Court does not require attorneys working, as were these counsel, in changing areas of the law to be prescient in their ability to define "the exact parameters of the court's willingness to grant relief," *Zurcher*, 64 F.R.D. at 684, in dividing the limited quantity of fees available in this action priority must be given to efforts that played a substantial role in producing the final recovery.

In setting the appropriate rate of compensation, the Court has followed the exam-

have relied on that estimate in refraining from raising objections to the proposed settlement agreement. Furthermore, while recognizing that the percentage approach is not in itself a sufficient basis for calculating attorneys' fees,

the Court cannot ignore the fact that fees and costs awarded, even when limited to the estimate provided in the notice, will constitute well over one third of the total settlement fund.

ple of the *Equity Funding* decision and has considered within this factor the degree to which other employment was precluded and the customary fee for similar services. The Court has also given considerable weight to the experience of counsel and the level of skill necessary to perform given services. *See Copeland*, at 890.

■ Several petitions requested an upward adjustment in the basic lodestar based on the quality of representation. This Court has carefully weighed such requests in light of the work observed by the Court, the novelty and complexity of the issues involved, and the amount of recovery gained, and has concluded that in no case does counsel's effort rise to the unusual degree of skill that a quality multiplier is designed to reward. *Lindy I*, 487 F.2d at 168. The level of performance necessary to qualify for a quality multiplier must be particularly outstanding where, as here, a limited fund is available. Under these circumstances, the Court must have as its first priority the award to all counsel of fees that reflect the basic value of their services to the class.

The Court has similarly concluded that an augmentation of fees based on the contingent nature of this litigation is not appropriate in the case of any counsel. While plaintiff's counsel faced a difficult burden in unraveling a complex fact situation, attempting to certify classes that represented arguably distinct interests, and conducting settlement negotiations on a nationwide basis among a variety of parties, counsel will be adequately compensated for these endeavors by the fee set by the Court, which already takes into consideration the level of skill necessary to carry out this difficult representation.

■ The Court does find in several cases, however, that an "inverse multiplier" is appropriate based on the low level benefit to the class secured by the services of counsel.

The Court is permitted under the lodestar scheme "to reduce the objectively determined fee where the benefit produced does not warrant awarding the full value of the time expended." *Merola v. Atlantic Richfield Co.*, 515 F.2d 165, 168–69 (3d Cir. 1975); *see also Knutson*, 479 F.Supp. at 1270–71, 1278.[11]

Finally, in applying this analysis, the Court has borne in mind that the burden of proof in asserting equitable entitlement to attorneys' fees rests on the petitioner. *Johnson*, 488 F.2d at 720. Any uncertainties arising from inaccuracies or incompleteness have been resolved against the petitioner seeking to share the fund. *Desimone v. Industrial Bio-Test Laboratories, Inc.*, 83 F.R.D. 615, 622 (S.D.N.Y.1979).

## IV

Counsel have submitted petitions totaling $1,021,358 for services rendered to the plaintiff class.

### A. *Counsel for the Rema Plaintiffs.*

Mr. Robert Lieff performed a crucial role as a principal negotiator in both the settlement of the MDL cases and the *Honokowai* action. While the hours for which his firm seeks compensation are among the highest in this litigation, his time records and those of his associate present a detailed record of efforts beneficial to the interest not only of his own subclass of non-Papakea investors but to the entire CU plaintiffs' class. While a substantial number of Mr. Lieff's hours were spent in reviewing pleadings by other parties, his role as a principal settlement negotiator and tactician justified this amount of review. *See Penn Central*, 416 F.Supp. at 916–17. Mr. Lieff appears to have properly apportioned tasks between himself and his associate, Ms. Cabraser, in that he spent the bulk of his time preparing pleadings and conducting negotiations with other counsel while Ms. Cabraser performed

---

**11.** In applying an inverse multiplier of 25 percent, the *Knutson* case focused on the nominal recovery awarded to plaintiffs. While the recovery derived by plaintiff class from this settlement is more than merely nominal, the peti-

tions in which the Court has applied an inverse multiplier have focused not on the amount of recovery but the benefit derived by the class from the particular services for which payment is sought.

research and drafting of documents. Eighteen hours of time sought for court appearances by Ms. Cabraser have been deducted since the class was adequately represented at these hearings by Mr. Lieff. *See Seigal,* 1979 Transfer Binder at 95,554 (deducting hours for unnecessary appearances by two counsel). For the same reason, 11 hours in appearances at hearings must be deducted from the amount of time sought by Mr. Wilcox, since the *Rema* plaintiffs were adequately represented by Mr. Lieff's presence. While some duplication of effort may have taken place in negotiations in which both Messrs. Lieff and Wilcox participated, negotiations in a case as complex as this one may reasonably require the services of two attorneys.[12] Hours requested by the Chee firm represent work by local counsel on the *Honokowai* action and are properly compensable.

■ Mr. Lieff's requested billing rate of $125 per hour would appear extraordinarily high for the senior lawyer in a two-person office were it not for the fact that he has had 18 years of experience in complex securities litigation on a nationwide basis similar in scope to this litigation and has received this hourly rate in other recent litigation.[13] Payment of this high fee is also appropriate in light of the substantial preclusive effect of so many hours on a two-person practice. Mr. Wilcox' fee of $110 is likewise justified by his participation in at least six previous complex actions, together with 10 years of general civil experience. Ms. Cabraser, by contrast, graduated from law school less than one year before beginning work on this action. An appropriate fee, taking into account her experience, is $50 per hour for work performed through

February, 1980, and $60 per hour thereafter.

Among all plaintiffs' counsel, the work of the *Rema* counsel appears most deserving of augmentation based on quality and contingency. *Rema* counsel entered this complex action despite the entry of summary judgment against the *McDonald/Mendelsohn* plaintiffs, and played a substantial role in bringing about a settlement notwithstanding the heavy burden they faced in overcoming the collateral effect of that summary judgment. *Rema* plaintiffs also faced complex and novel issues concerning the certification of their proposed investor class. Despite this difficult burden, *Rema* counsel recovered a 12 percent return for non-Papakea investors in this action as well as benefiting the remainder of the CU class through settlement negotiations. In light of the high rate of fees awarded, however, it cannot be said that *Rema* counsel have not been compensated for the benefit they conferred on the class, or that the compensation at these rates underestimates the skills demonstrated by these plaintiffs. For this reason, the *Rema* counsel's request for a multiplier of 1.15 is denied. The law firm of Robert Lieff is thus awarded the basic lodestar figure of $174,694, the law firm of Mills & Wilcox is awarded fees of $8,046, and the Chee law firm is awarded fees of $618.

With the exception of *Rema* counsel's internal copying expenses, which are more appropriately recompensed at 10 cents rather than 20 cents per page, the request for costs expended is reasonable. The Court, therefore, awards costs of $15,014 to the law firm of Robert Lieff, $1,336 to the law firm of Mills & Wilcox, and $6,199 to plaintiff deposees for their costs.

---

12. Mr. Wilcox' participation in settlement negotiations has been described as conferring a substantial benefit on the class through his ability to focus discussion on the central issues that divided the parties. *See* Receiver's comments on fee petitions at 23 filed in this action December 12, 1980.

13. In determining the customary fee, the Court should consider the customary fee of the attorney or the fee charged for similar services in the same locality. This standard applies in class action securities litigation in the same manner as other litigation. *See Jarstad v. IDS Realty Trust,* 49 U.S.L.W. 2593 (8th Cir. 1981). In this case the requested fee does reflect the fee charged by this attorney for the past three years. *See* declaration of Robert Lieff at 7.

### B. *Law Firm of Robert Jaffe, P.A.*

Mr. Robert Jaffe and his associate, Mr. Howard Schlesinger, served as representatives for the *Jala* group of investors and provided the longest record of continuous prosecution of this action, beginning in December, 1976. Mr. Jaffe's efforts substantially benefited the remainder of the CU class by keeping the MDL action alive after the entry of summary judgment against the original plaintiff investors, represented in the *Mendelsohn/McDonald* complaints.

A review of the Jaffee firm's petitions shows that four hours should be deducted for time spent by Mr. Jaffe in attempting to file late claims in the Hawaiian interpleader action that were unrelated to these MDL proceedings. An additional 15 hours has been deducted for hours spent in attempting to exclude the *Jala* named plaintiff from the proposed settlement, efforts that provided no benefit whatsoever to the CU class. A further reduction in the Jaffe/Schlesinger hours is required by apparent inaccuracies in their time records. By their own statement,[14] counsel reconstructed their time records. While such reconstruction does not automatically require a reduction, where the records are reasonably detailed, *Grinnell II*, 500 F.2d at 1102–03, the large units in which time was recorded, and apparent errors in listings of telephone conversations[15] suggest that these time records were not "conservatively reconstructed" in a manner that would allow the Court to repose confidence in their accuracy. Counsel bears the burden of establishing the accuracy of their time records. *See Waters*, 485 F.Supp. at 112–13. In this case, the only possible method of dealing with this suspected inaccuracy in time records is an across-the-board reduction of 5 percent. *See Heigler v. Gatter*, 463 F.Supp. 802, 803–04 (E.D.Pa.1978).

Messrs. Jaffe and Schlesinger have requested historic hourly billing rates. As with Mr. Lieff, Mr. Jaffe's requested fee of $125 per hour appears high for a small local practice, but reasonable for the type of nationally-based securities litigation in which he has recently been engaged.[16] However, Mr. Jaffe appears to have substantially less experience in complex litigation matters than Mr. Lieff. The degree to which Mr. Jaffe's efforts were spread over a four-year period also mitigates in favor of a more moderate fee. For these reasons, the Court finds $100 per hour to be an appropriate figure for services rendered by Mr. Jaffe in 1977 and 1978, and $115 per hour for services rendered in 1979 and 1980. Mr. Schlesinger's requested fee of $75 per hour appears reasonable in light of his minimum of three years of experience with complex litigation, particularly in light of the fact that he did not change this rate over a four-year period.

*Jala* counsel have had to contend with the same problems of collateral estoppel and class certification discussed previously with regard to the *Rema* plaintiffs. Notwithstanding this burden, *Jala* counsel's effective prosecution of this action through 1978 ultimately contributed substantially to the settlement by preserving the claims of a broad class of investors. In the course of the 1980 settlement negotiations, however, it became apparent to the Court that Mr. Jaffe has sought to protect the interests of individual clients to the detriment of the class he was supposed to represent. This conflict was particularly apparent in Mr. Jaffe's decision to pull out of the proposed July settlement. Contrary to Mr. Jaffe's suggestion in his petition,[17] the fact that the parties have arrived at a broader settlement is in no way due to Mr. Jaffe's conflict of interest. Indeed, Mr. Jaffe's actions resulted in a substantial cost to the class in fees sought by other plaintiffs' counsel for efforts between July 12 and September 1, 1980, the point at which Mr. Jaffe opted

---

14. Affidavit of Robert Jaffe at 4.

15. *See* Receiver's comments, *supra* note 12, at 17.

16. *See* note 12, *supra*. The requested hourly rates were previously awarded to counsel in other recent litigation. *See* memorandum of points and authorities of Robert Jaffe at 10.

17. *Id.*

back into the settlement.[18] The CU class should not be required to bear these unnecessary costs, brought about by the Jaffe firm's overzealous protection of the interests of an individual plaintiff at the expense of other clients. *See Armored Car*, 472 F.Supp. at 1387 (eliminating the time expended for named plaintiffs that did not benefit the remainder of the class). This harm to the class interest mandates denial of the Jaffe request for a multiplier and justifies the imposition of an inverse multiplier of 1.10, reflecting poor quality of service in the settlement stage of the proceeding.

On this basis, the Jaffe law firm is awarded total attorneys' fees of $115,435.

As in the case of the *Rema* counsel, counsel for the *Jala* plaintiffs have sought costs for internal copying at twice the reasonable amount. It is also apparent from petitioner's affidavit that efforts expended by local counsel for which reimbursement has been sought were for the benefit of individual claimants in the Hawaiian interpleader action and should be excluded from petitioner's costs. Total costs of $23,790 are awarded.

### C. *Law Firm of Sills, Beck, Cummis, Radin & Tischman.*

Mr. Jeffrey Barton Cahn of the law firm of Sills, Beck, Cummis, Radin & Tischman, filed an action on behalf of an individual investor, Alice Y. Johnson, in May, 1977, which was consolidated with the other MDL litigation in January, 1979. Mr. Cahn associated with Mr. Jaffe as co-counsel for the *Jala* plaintiffs after his initial appearance before this Court in October, 1979. Mr. Cahn seeks compensation only for his services after that point. His affidavit indicates that his services in this litigation consisted primarily of providing a liaison with other counsel, reviewing pleadings, partici-

pating in settlement negotiations, and court appearances. The exact nature of Mr. Cahn's contribution to the class as a whole is not apparent in his affidavit in support of costs. It also appears that Mr. Cahn's appearances before this Court on July 11, 1980, and October 3, 1980, were duplicative and provided little benefit to the class in light of the fact that Mr. Cahn's co-counsel was present. *E.g., Seigal*, 1979–80 Transfer Binder at 95,554.[19] Therefore, 32 hours in travel time and 17 hours in time spent at court appearances are deducted. For similar reasons, the Court will not compensate Mr. Cahn for his time and expenditures in appearing at the December 19, 1980, final settlement hearing.

Petitioner has sought fees for his services at historic rates and has demonstrated sufficient past experience in multidistrict litigation to justify these rates. However, the relatively high rates are not justified by the nature of many of the services rendered by Mr. Cahn. A substantial amount (40 percent) of Mr. Cahn's requested hours was spent in traveling, effort that required no particular legal expertise, *see Equity Funding*, 438 F.Supp. at 1330, 1343, while a nearly equal amount of time (60 hours) was spent in reviewing documents, which also did not require the skills reflected in the premium rates sought by Mr. Cahn. Actual negotiations and conferences with other counsel for which substantial skill and experience would be necessary constituted a relatively small amount (34 hours) of Mr. Cahn's requested time. Therefore, the hours requested for travel that have not been struck will be compensated at the rate of $40 per hour while a rate of $75 per hour will be awarded for time spent in reviewing pleadings.

Mr. Cahn's requested costs will be reduced by $1,500 to reflect the Court's estimate of his travel expense for the two

---

**18.** The Receiver's counsel estimates these fees to amount to approximately $33,000. *See* Receiver's comments, *supra* note 12, at 20.

**19.** While Mr. Cahn has stated that he functioned as liaison counsel, his time sheets demonstrate little activity in this regard that would justify his appearance at these hearings. Mr.

Cahn himself noted with regard to another court appearance concerning settlement, on October 19, 1980, that in his absence the interests of the *Jala* plaintiffs were adequately represented by Mr. Jaffe. Affidavit of Jeffrey Barton Cahn at 6.

unnecessary trips that he made to San Francisco.

For the above reasons, the Court awards total attorneys' fees to the law firm of Sills, Beck, Cummis, Radin & Tischman of $9,708, and total costs of $1,222.

### D. *Law Firm of Quantz & Cerny.*

Messrs. Charles and Cerny filed the initial actions in this litigation, the *Mendelsohn* and *McDonald* complaints and, subsequently, the *Wheeler* complaint. The establishment and maintenance of these actions within the period of the statute of limitations constituted the principal benefit of Quantz & Cerny's efforts, and the Court has recalculated the hours requested by this firm to reflect time expended in filing the complaints, and in opposing initial motions for summary judgment, as well as discovery motions. The Court has deducted hours expended in preparing memoranda concerning the professional defendants' summary judgment motion, which was eventually decided against the *Mendelsohn/McDonald* plaintiffs, plaintiffs' motion for summary judgment against defendant Harris Kerr Forster, which was denied, and plaintiffs' motion for class certification which was denied in part due to an apparent conflict of interest in Quantz & Cerny's representation of named plaintiff Mendelsohn and the remainder of the class. Far from providing a substantial benefit to the CU class in facilitating the final recovery, *see, e.g., Altman,* 580 F.2d at 661, the efforts of Quantz & Cerny, particularly with regard to the professional defendants' summary judgment motion, would, but for the work of other counsel in settling this action, have resulted in a complete loss of recovery for the *Mendelsohn/McDonald* plaintiffs. Moreover, the entry of summary judgment in favor of the professional defendants presented the remainder of the CU class with a difficult issue of collateral estoppel.

The Court also disallows 275 hours of time claimed on behalf of Mr. Cerny's estate by Mr. Quantz for time thought to have been expended by Mr. Cerny in 1975.

Mr. Quantz was unable to provide time records of any sort for this period for Mr. Cerny, while it appears from Mr. Quantz' records and the minimal activity on this case in early 1976 reflected in Mr. Cerny's records that Mr. Cerny, indeed, spent little time on this action. In the absence of records, the Court must weigh uncertainty as to accuracy in favor of the class rather than petitioning counsel. *See, Desimone,* 83 F.R.D. at 622.

Calculating petitioner's hours on the above basis, the Court finds that 334.2 hours were spent by Mr. Quantz in activities that benefited the class, while 567 hours of beneficial time were expended by Mr. Cerny.

Petitioner's affidavit indicates that Mr. Cerny charged rates of $60–$80 per hour during the period in question. A review of Mr. Cerny's experience in the securities law field suggests that $70 is an appropriate average fee for his services during this period. Such an amount also takes into effect the preclusive effect of this litigation in the later months of Mr. Cerny's involvement. While Mr. Quantz has sought reimbursement at the high end of his historic rate scale ($125 per hour), his affidavit fails to detail any prior experience in complex securities litigation equivalent to this action that would justify so high a fee. The Court, therefore, will compensate Mr. Quantz at the rate of $100 per hour.

Petitioner has sought a multiplier of 1.5 to take into account the contingent nature of this action and the result to which counsel believe their efforts materially contributed. As indicated, *supra,* however, the greatest "risk" factor in this litigation was the entry of summary judgment against plaintiffs represented by these counsel, and their efforts only minimally benefited the CU class as a whole. In light of the paucity of discovery material apparently produced by the efforts of Messrs. Quantz and Cerny,[20] and the fact that such discovery as was available was not useful to succeeding

20. *See* Receiver's comments, *supra* note 12, at 3.

counsel,[21] and, finally, that Messrs. Quantz & Cerny were not the only counsel maintaining the viability of the CU class in this period,[22] the Court finds that an inverse multiplier of 1.25 will most accurately reflect the reasonable value of these services to the CU class. *See Knutson*, 479 F.Supp. at 1278.

Petitioner's requested costs are also reduced to reflect the exorbitant costs attributed to in-house printing,[23] and the lack of apparent benefit derived by the CU class from the services of George Cerny, a certified public accountant. It is apparent from petitioner's time sheets that much of the effort expended by Mr. Cerny involved plaintiffs' unsuccessful attempt to avoid summary judgment in the *Mendelsohn/Mc-Donald* actions. It is also apparent that George Cerny's status as a relative of plaintiffs' counsel Cerny severely undercut his usefulness to the CU class as an expert witness. For these reasons, the Court disallows all but $2,000 of the consultant and expert fees attributed to George Cerny.

For these reasons, the Court awards fees to Mr. Quantz of $25,065 and to Mr. Cerny's estate of $29,750. Total costs are awarded of $16,170.

### E. *Law Firm of Cooke & Macke.*

The law firm of Cooke & Macke, which succeeded Quantz & Cerny as attorneys for the *Mendelsohn, McDonald,* and *Wheeler,* plaintiffs in November, 1978, seeks compensation for 2,415 hours, the highest number of hours of any of plaintiffs' counsel. While these services were provided by seven different attorneys, the principal efforts are attributed to Mr. James Cooke, the senior partner in the firm, who requests compen-

sation for 1,783 hours at $125 per hour. Petitioner's handwritten time sheets, to the extent they are legible, demonstrate substantial abuse of the attorneys' fees process. For example, counsel expended a total of 616.2 hours in internal office conferences during a period in which they were actively litigating less than a year. Petitioner also seeks compensation for 140 hours of travel time, including 31 hours expended at professional education seminars.[24] Rather than attempt to eliminate unnecessary or duplicative hours, the Court has focused on those activities of counsel that resulted in a benefit to the CU class. While Mr. Cooke has claimed that the class was substantially benefited by his firm's efforts to combat the professional defendants' summary judgment motion as discussed above, the result of those efforts was a substantial detriment to the plaintiff class.[25] Subsequent efforts by Mr. Cooke to obtain further evidence presenting genuine issues of material fact were completely unsuccessful,[26] and no appeal was filed from the grant of summary judgment. The only activities by Mr. Cooke and his associates that appear to have provided any contribution to the eventual recovery in this litigation were depositions taken by the firm of the professional defendants that were subsequently made available to other plaintiffs' counsel, Mr. Cooke's contribution to settlement negotiations, and the continued maintenance of the *Wheeler* action. While petitioner has sought to be compensated for representation by both Mr. Cooke and a senior associate at the Hawaii depositions, such representation appears duplicative, and the Court will only compensate hours expended

21. *See* affidavit of James Cooke at 9, 12.

22. The *Jala* class action also survived motions to dismiss based on the statute of limitations in the initial stages of this litigation.

23. The Receiver's counsel has estimated that the amount requested by petitioners would produce approximately 41 feet of copies—a staggering amount even for this litigation. The amount awarded, therefore, is reduced by 50 percent.

24. *See* entries of February 22–23, 1979 (23 hours) and April 19, 1980 (8 hours).

25. While petitioners' failure to present evidence of a genuine issue of material fact may have been due in part to the poor results of their predecessor's discovery, petitioners, not the plaintiff class, should bear the loss resulting from their predecessor's activities. *See Steinberg v. Carey*, 470 F.Supp. 471, 479 (S.D.N.Y. 1979).

26. *See* R.T., November 9, 1979, at 20.

by the associate together with the hours in which Mr. Cooke advised him, a total of 192 hours for the associate and 34 hours for Mr. Cooke. The petitioner's time sheets suggest that approximately 80 hours were spent maintaining and participating in settlement negotiations, while 20 hours should be allowed for monitoring of pleadings, filing an amended complaint in the *Mendelsohn* and *Wheeler* actions, and other activities necessary to maintain the viability of the suits through the settlement period.

Mr. Cooke's affidavit has demonstrated considerable experience in complex securities litigation, and the number of hours requested, even if improperly allocated, certainly precluded him from other litigation during much of the first year of his representation. These factors justify a fee of $110 per hour but only on activities that required the skill that accompanies this premium rate. *See Equity Funding*, 438 F.Supp. at 1330. The fee sought for Mr. Brian Lewis, a fourth-year associate who participated in the depositions is also appropriately set at $90 per hour in light of his experience. Hours spent in settlement did require substantial skill and experience and will be compensated at Mr. Cooke's rate. However, hours credited to maintenance of these actions following entry of summary judgment involved efforts appropriately performed by senior associates and, thus, will be compensated at $90 per hour.

Petitioner has failed to justify the cost of two certified public accountants in this action and the amount of fees requested for the work of George Cerny is, accordingly, offset by $2,376 paid to R. Lawrence, which appears from the affidavits filed to be duplicative. In keeping with the lack of benefit derived by class members from petitioner's efforts to combat the professional defendants' summary judgment action, accountant Cerny's remaining fees should be halved to reflect approximate efforts expended in that unsuccessful work. Finally, travel costs for trips apart from $2,000 allowed for discovery in Hawaii should be deducted. These reductions result in total

costs of $21,606, a figure below the amount which petitioner has indicated it was reimbursed by its named plaintiffs.[27] In the absence of evidence that these reimbursements will be refunded to the named plaintiffs, the Court finds that petitioner has already been compensated for its costs and declines to award further costs.

The Court, therefore, awards the law firm of Cooke & Macke attorneys' fees of $31,620 and awards no amount for costs.

### F. *Law Firm of Gelber & Wagner.*

In addition to initiating several actions, including the *Honokowai* action that led to a $750,000 contribution to this settlement fund, the petitioner, as counsel for the Receiver of the CU corporations, played a vital role in negotiating the settlement of the MDL and *Honokowai* actions. The Receiver drafted early settlement proposals on which subsequent proposals were founded, drafted the settlement agreement of October 3, 1980, and provided revisions necessary to bring about the "global settlement" approved on December 19, 1980. Other time was expended in research, drafting of pleadings, and review of pleadings, the latter an appropriate function since petitioner occupied a pivotal role in settlement negotiations. Petitioner's time records are clear, and demonstrate no apparent duplication of effort. Assignment of tasks between Mr. James Wagner, petitioner's lead counsel, and his senior partner and associates appears appropriate in that the senior partner exercised oversight while routine tasks and research were performed by associates.

The rate of compensation sought by petitioner appears commensurate with counsel's experience. Mr. Don Gelber, the firm's senior partner, seeks compensation at the rate of $125 per hour and has had considerable experience in the last 11 years in complex corporate reorganization and insolvency matters. Mr. James Wagner, the principal counsel from this firm, seeks compensation of $100 per hour after 5 years of experience in complex, multidistrict litigation. Compensation of $65 and $55 per hour for two

---

**27.** Cooke affidavit, Exhibit C.

associates of the firm appropriately reflects their limited experience and the customary rate in the petitioner's locale. Only petitioner's hours expended in pure travel time [28] will be compensated at a lower rate of $40 per hour.

While petitioner faced novel issues in litigating the entitlement of investors to profits from the Papakea project, they received substantial assistance from other class counsel, notably *Rema* counsel. Receiver's counsel are to be commended for skillfully bringing together numerous conflicting interests, particularly in bringing about the participation of the *Honokowai* defendants in this action. Moreover, unlike the usual receiver's counsel, petitioner could not depend on recovering its fees from corporate assets since such assets were marginal in this litigation at best. Petitioner, thus, faced substantial risk in participating in this litigation. Despite these considerations, however, the Court is in no better position to award a multiplier to this petitioner than it is in the case of the *Rema* plaintiffs' counsel, in light of the limited amount of funds available for distribution in this action. The Court believes, in any event, that petitioner has already been substantially compensated by the rates set above for the skill requisite in assisting this settlement.

The Court, therefore, awards the law firm of Gelber & Wagner attorneys' fees of $52,708 and costs of $8,022.88.

### G. *Law Firm of Citrino, Balsam, Daunno & Strober.*

The Citrino firm, and principally William Balsam, represented intervening plaintiffs in the *Honokowai* action, and other CU investors in a New Jersey state court action unconnected with this MDL litigation. It is evident from a review of petitioner's time sheets that the vast majority of Mr. Balsam's efforts related to review of pleadings in cases in which the Citrino firm did not represent a party, or in cases that were not

before this Court. The sole benefit to the CU class represented in this settlement from petitioner's effort was some minimal benefit from Mr. Balsam's 1976 background investigation in Hawaii [29] which resulted in the referral of the *Wheeler* plaintiffs to the firm of Quantz & Cerny, Mr. Balsam's representation of the *Wheeler* plaintiffs at depositions in San Francisco, and his representation of intervening plaintiffs in the *Honokowai* action. At best, only 20 of petitioner's 73 hours in Hawaii benefited the plaintiff class in this settlement. Forty-five hours expended in filing and reviewing pleadings and settlement agreements in the *Honokowai* action and 32 hours in depositions can also be said to have minimally benefited the plaintiff class in this settlement.

The petitioner has furnished no affidavits concerning the general fees in his area, but does indicate that he is seeking rates that are below normal. Mr. Balsam's rate of $100 per hour is not high for a senior partner, but is high for the kind of services (reviewing pleadings) that he spent the vast majority of his time providing here. Mr. Balsam also admits no past experience in securities litigation. In view of these considerations, the Court finds that an appropriate rate for his services is $75 per hour.

No multiplier based on quality or contingency appears appropriate in this instance. While petitioner's clients, as Papakea investors, will realize approximately a 21 percent return on their investment, there is no indication in petitioner's affidavits that any of this return was produced by petitioner's efforts apart from its filing a complaint in intervention in the *Honokowai* action. At best, this firm served only a "watchdog" function in reviewing pleadings.

In light of the relative inexperience and low benefit evidenced by petitioner's affidavit, the Court awards the law firm of Citrino, Balsam, Daunno & Strober attorneys' fees of $7,275. In keeping with the above

---

**28.** Counsel for Receiver's memorandum in support of motion for fees at 15.

**29.** The principal benefit from this trip was the filing of a New Jersey state court action unrelated to this litigation. Balsam amended affidavit at 3.

determination of benefit derived from Mr. Balsam's trip to Hawaii in 1976, the Court will deduct two-thirds of the cost of that trip from petitioner's costs. In view of the presence of other counsel for the *Wheeler* class at this Court's hearing on the final settlement on December 19, 1980, the Court finds petitioner's attendance at that hearing duplicative and declines to recompense petitioner's costs. The Court will award costs to petitioner of $2,419, and to petitioner's deposées of $1,215.

### H. *Law Office of Paul E. DiBianco.*

Petitioner seeks compensation for 6 hours of work in reviewing the final settlement agreement as local counsel for the Citrino firm. Although petitioner has not complied with the Court's directive to state the *Kerr* facts relevant to its petition, the hourly amount sought appears to be a reasonable figure for the services provided. Petitioner seeks payment at a rate of $75 per hour, a reasonable amount for a sole practitioner in securities litigation. The Court, therefore, awards attorney's fees of $469 and costs of $10.50.

### I. *Law Firm of Dinkelspiel &*
### *Dinkelspiel.*

Petitioner represented a group of investors holding limited partnership interests in the Papakea condominium project. Petitioner actively participated in the Hawaiian interpleader action and played a central role in negotiations leading to both the MDL and *Honokowai* settlements.

Petitioner seeks compensation for a total of 241.9 hours expended in efforts related to this litigation. While the Papakea investors represented by petitioner had interests potentially at variance with other plaintiffs who had invested in unsuccessful CU projects and sought to share in the profits from the Papakea project, petitioner's efforts benefited both its own clients and the remainder of the CU class by producing agreements that reduced costly and counterproductive disputes among the plaintiffs and enabled all parties to share in the portion of the fund contributed by the *Honokowai* defendants. The bulk of the hours for which petitioner seeks compensation were

spent in these settlement negotiations. Petitioner has *not* sought compensation for services unlikely to provide some benefit to the CU class as a whole, such as the preparation of a petition for intervention by its clients in the MDL action. No duplication of effort is apparent in petitioner's time sheets, and the time sheets demonstrate a reasonable division of responsibilities between the lead partner and senior associate working on this case.

Petitioner has used historic rates and the fees charged by the two attorneys who did virtually all the work appear to be reasonable in light of their experience and the customary fee in their locale. Mr. Taylor, a senior level partner with 24 years of experience, including substantial complex insolvency litigation, seeks reimbursement at $120 per hour before July, 1980, and $130 per hour thereafter. Mr. Benvenutti, a fourth-year associate with a relatively large firm, seeks $85 per hour before July, 1980, and $100 per hour thereafter for the performance of at least 75 percent of this firm's services in this litigation. The Court finds that these amounts accurately reflect counsel's skill, experience, and customary fee.

Petitioner faced difficult legal problems in establishing the vicarious liability of non-CU general partners in the Papakea project. It also confronted a practical problem in negotiating settlement on behalf of its clients since they had already received more than 100 percent of their original investment from the Hawaiian interpleader disbursement. Despite these difficulties, the petitioner succeeded in gaining an additional return of 21 percent of its clients' investment. Much of this return is directly traceable to petitioner's skill in assisting the settlement of the *Honokowai* action, which boosted the Papakea limited investors' gross share of the settlement fund from $100,000 to a guaranteed minimum payment of $400,000. While the skill demonstrated by this substantial benefit to its clients might, in the ordinary case, justify a multiplier based on quality, the Court is constrained from awarding one in this action by the

fact that these benefits primarily redounded to only a portion of the CU fund. A multiplier would only further lessen the amount of recovery available to other CU investors who have not fared so well in this settlement agreement.

The Court finds the costs submitted by petitioner to be reasonable. For all these reasons, the Court awards the law firm of Dinkelspiel & Dinkelspiel attorneys' fees of $23,045 and costs of $5,386.

A summary of the fees and costs requested by counsel and awarded by the Court is set forth in Exhibit A attached hereto.

V

 Based on its review of the petitions for attorneys' fees and costs, applying the factors mandated by *Kerr* and the procedures first described in *Lindy I,* this Court awards attorneys' fees in the amount of $478,433 and costs totaling $80,784, figures within the estimates made by counsel to the class they represent. While the responsibility of passing judgment on individual attorneys' use of their time is one distasteful to the Court and unlikely to produce satisfaction among any of the petitioning counsel, the Court has been given no other option by the extraordinarily inflated petitions of some counsel in this action. The premium which the Court has placed on efforts that truly benefited the class balances both the public's interest in promoting effective class representation and the interest of the plaintiffs' class in its action in recovering a substantial share of the fund created by the efforts of their counsel.

EXHIBIT A

FEES AND COSTS REQUESTED AND AWARDED

| Petitioner | Hours Requested | Hours Awarded | Rates Requested | Rates Awarded | Fees Requested * | Fees Awarded | Costs Requested | Costs Awarded |
|---|---|---|---|---|---|---|---|---|
| *Rema* Counsel | | | | | | | | |
| 1. Office of Robert Lieff | 2056.4 | 2038.4 | $60–125 | $50–125 | $188,015 | $174,694 | $19,557 | $15,014 |
| 2. Mills & Wilcox | 86.6 | 75.6 | 110 | 110 | 9,526 | 8,046 | 1,458 | 1,336 |
| 3. Chee, Lee | 6.7 | 6.7 | 60–100 | 60–100 | 618 | 618 | — | — |
| 4. Plaintiff Deposees | | | | | | | 6,199 | 6,199 |
| Office of Robert Jaffe | 1430.75 | 1344.00 | 75–125 | 75–115 | 142,975 | 115,435 | 28,485 | 23,790 |
| Sills, Beck | 175.41 | 121.00 | 85–110 | 40–110 | 21,118 | 9,708 | 2,722 | 1,222 |
| Quantz & Cerny | 1916.0 | 901.2 | 80–125 | 70–100 | 178,885 | 54,815 | 32,088 | 16,170 |
| Cooke & Macke | 2415.0 | 326.0 | 75–125 | 90–110 | 277,810 | 31,620 | 29,436 | — |
| Gelber & Wagner | 515.45 | 515.45 | 52–125 | 40–125 | 54,268 | 52,708 | 8,022 | 8,022 |
| Citrino, Balsam | 333.0 | 97.0 | 60–125 | 70 | 31,485 | 7,275 | 6,027 | 3,634 ** |
| Paul E. DiBianco | 6.25 | 6.25 | 75 | 75 | 469 | 469 | 11 | 11 |
| Dinkelspiel & Dinkelspiel | 236.3 | 236.3 | 25–130 | 25–130 | 23,045 | 23,045 | 5,386 | 5,386 |
| | | | TOTAL FEES AND COSTS AWARDED | | | $478,433 | | $80,784 |

* Before requested multiplier, if any.

** Includes costs to plaintiffs' deposees of $1,215.